Black Dome Corporation v. Commissioner.
Black Dome Corp. v. Commissioner
Docket No. 7323.
United States Tax Court
1946 Tax Ct. Memo LEXIS 172; 5 T.C.M. (CCH) 455; T.C.M. (RIA) 46130; May 31, 1946
William T. Griffith, Esq., and Henry F. Mathies, C.P.A., Room 809, 176 Broadway, New York 7, N. Y., for the petitioner. Wm. A. Schmitt, Esq., and S. V. Ekmann, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion This proceeding involves deficiencies in income taxes in the amounts of $1,398.33, and $3,077.40 for the calendar years 1941 and *173 1942 respectively, and in declared value excess-profits tax for 1942 in the amount of $902.38. The question presented in whether respondent erred in disallowing certain deductions claimed by petitioner as business expenses, including net operating loss deductions sought to be carried over from prior years, on the ground that such expenses were personal, living or family expenses of petitioner's sole stockholder. Findings of Fact Petitioner is a corporation organized under the laws of the State of New York, having its principal office in New York City. The returns for the years herein involved were filed with the collector of internal revenue for the second district of New York. Petitioner was organized on December 16, 1926 by Robert Colgate, Sr. All of its authorized stock was issued, at his direction, to his five children and held by them in equal shares. The sole property owned by the petitioner during the years 1941 and 1942 consisted of two tracts of land located in Greene County, New York, near the town of Tannersville. The smaller tract comprised about 75 acres whereas the larger tract covered an area of about 6,000 acres, including about 5,000 acres of woodland and from *174 500 to 1,000 acres of open land. The improvements on this property included a frame dwelling of 17 rooms and a number of other dwellings, barns, garages and out buildings. There were also two artificial lakes of about 35 and 50 acres, respectively, and about 2 1/2 to 3 miles of trout stream. This property had been acquired by Robert Colgate, Sr. in about 1910 and was transferred by him to petitioner when the latter was organized in 1926. From 1910 to 1926 the property was used for recreational purposes only by Robert Colgate, Sr. From 1926 to 1932, when he died, the property was devoted to similar use. From 1932 to February 3, 1940, the property was used only for recreational purposes by one of the then stockholders of the petitioner. In the period from 1932 to 1940, the operation of the property was the subject of discussion between Robert Colgate, son of Robert Colgate, Sr., and the other stockholders. The petitioner had no income during this period and engaged in no business activity; its shareholders were required to contribute from seven to ten thousand dollars annually for maintenance costs. On February 3, 1940, Robert Colgate purchased all of the shares of the petitioner *175 held by his four brothers and sisters for a total consideration of $800. He acquired complete control of the petitioner with the intention of putting the corporation on a paying basis. After acquiring all of the stock, Colgate consulted an organization called "Woodland Management" which made a business of rendering advice on operating properties of this type profitably. Colgate made a cruise of the property with the manager of this organization and a timber expert associated with it. Woodland Management advised him to conduct timbering operations on a selective basis, cutting only trees with a diameter of 14 inches or more. On about July 31, 1940, petitioner entered into a timbering contract and timbering operations were conducted during the years 1941, 1942 and parts of 1943. Petitioner's gross receipts from these operations were $12,392.43 in 1941 and $26,383.65 in 1942. Petitioner's property was not occupied during 1940, except by the superintendent and such other employees as were normally on the premises. During the summer of 1941 the property was rented to a Mrs. Guest, who was not related to Colgate, for the sum of $1,200. The property was also rented for the summer of 1942 *176 to a sister of Mr. Colgate for the sum of $1,000. The property was not rented again until the summer of 1945 when it was rented for two months. A flock of 80 to 100 sheep has been maintained on the property since 1943. In 1941 an effort was made to stock one of the lakes with fish, but the project failed because of some disease which affected the fish. This project was undertaken because petitioner intended to establish a fishing club on the premises, which club was to be operated for profit and not for the recreation of petitioner's sole stockholder. The project was abandoned during the war years but it is petitioner's intention to attempt to revive it now. Mr. Colgate did not make any personal use of the property in 1941 and 1942. In the year 1941 he visited the property three times for short periods on business matters and in November of that year he spent ten days there going over the timbering operation. In March 1942 he visited the property for a few days to look it over and to make arrangements for renting it to his sister for the coming summer. Mr. Colgate was with the United States Navy in a civilian capacity during June and July of 1942 and as a commissioned officer from *177 that time until September 1945. He did not visit the property again until November 1945. For the years 1939, 1940, 1941 and 1942, petitioner made the following expenditures: 1939
1940
1941
1942
Salaries and Wages
$2,460.00
$1,365.40
$1,366.96
$1,826.60
Real Estate and Other Taxes
1,921.13
1,834.89
2,121.95
2,188.87
Telephone
129.67
111.05
103.48
78.03
Electricity
51.98
37.32
85.87
135.73
Accounting
300.00
300.00
300.00
1,116.65
Auto Expenses
208.88
153.09
43.16
95.10
Dam Expenses
272.00
183.64
Livestock
88.23
108.32
Repairs and Supplies
92.07
379.78
378.44
383.15
66.64
Insurance
101.10
1,252.48
405.56
858.42
Miscellaneous Expenses
88.37
374.05
145.40
Depreciation
1,169.06
1,088.32
2,214.16
3,336.24
Farmhouse Operating Account
83.46
Painting
45.00
Legal Fees
179.15
325.00
Commission
120.00
Fuel
51.00
Cleaning
152.08
Kitchen Utensils, Linen, etc.
116.35
Dues and Assessments
110.00
Express Charges
3.35
Fish for Stocking Lake
235.00
Compensation of Officers
100.00
Interest
2,062.83
Contributions
10.00
Total
$6,882.49
$6,645.06
$8,554.64
$12,832.27
*178 In 1941 the large dwelling house was completely refurnished and certain improvements, including four new bathrooms and new plumbing, were made at a cost of about $25,000. The expenditures were made for the purpose of facilitating the renting of petitioner's property and resulted in the increased claims for depreciation in 1941 and 1942 as compared to the earlier years. The refurnishing was necessitated by the fact that when Robert Colgate acquired all of petitioner's stock, the furnishings then in the house included many pieces which had been in the family for many years and which the various children of the elder Colgate desired to have. Shortly after Colgate acquired all of the stock, these furnishings were divided up between them. Petitioner borrowed the funds for the improvements and refurnishing from its sole stockholder and gave him its notes for the sums borrowed. Petitioner claimed a deduction of $2,062.83 for interest paid on these notes in 1942. The sum of $110 was paid in 1941 to a club known as the Onteora Club as dues and assessments. Robert Colgate, Sr., had belonged to this club, which offered various recreational facilities and which was located near petitioner's *179 property. After the elder Colgate's death, the club membership was continued by his children. In 1941 the membership was continued in order to obtain good will and with the thought that it might facilitate the obtaining of memberships by petitioner's tenants. Petitioner's membership in the club did not entitle the lessees of its property to avail themselves of the facilities and privileges of the club. As set forth above, petitioner's expenditures for the year 1941 amounted to $8,554.64, which sum petitioner deducted as expenses in its return for that year. Respondent has allowed the deduction of $2,121.95 for real estate and other taxes but has disallowed the excess of the remaining expenditures, $6,432.69, over the amount of income received from the rental of the property, $1,200. The net disallowance was thus $5,232.69. In its 1941 return petitioner also deducted net operating loss carry-overs in the amounts of $5,713.43 for the year 1939 and of $2,656.51 for the year 1940. Respondent has allowed $1,921.13 of the net operating loss deduction claimed for 1939 and $1,834.89 of the sum claimed for 1940; the amounts allowed represent real estate and other taxes paid by petitioner *180 in those years. Petitioner's expenses for the year 1942 amounted to $12,832.27 of which respondent allowed $2,188.87 for taxes, $100.00 for compensation of officers, $2,062.83 for interest and $10 for contributions. The respondent disallowed the excess of the other deductions, $8,470.57, over the amount of income received from the rental of the property, $1,000. The net disallowance was thus $7,470.57. In its 1942 return petitioner also claimed a net operating loss carry-over of $3,744.83 for the year 1940 which respondent disallowed on the ground that the 1940 operating loss, which had been reduced to $1,834.89 as set forth above, had been entirely used in the reduction of 1941 income. Prior to February 3, 1940, petitioner was not engaged in carrying on any trade or business. After that date and during the taxable years here involved, petitioner was engaged in carrying on a trade or business. The items expended by petitioner in 1940, 1941 and 1942 as shown on page 5 of these Findings, and which are in dispute between the parties, were ordinary and necessary business expenses with the exception of the following items: livestock, miscellaneous expenses, legal fees, commissions, *181 dues and assessments, express charges, and fish for stocking lake. Opinion KERN, Judge: Respondent contends that the petitioner was not engaged in carrying on any trade or business during the taxable years here in question within the meaning of section 23 (a) (1) (A) of the Internal Revenue Code, the pertinent portions of which are set forth below. [1] It is respondent's position that the expenses of petitioner in 1941 and 1942, which it has disallowed, were personal, living or family expenses of petitioner's sole stockholder and as such were not deductible under section 24 (a) (1) of the Code. [2]
*182 To determine whether the activities of a taxpayer are "carrying on a business" requires an examination of the facts in each case. Higgins v. Commissioner, 312 U.S. 212; United States v. Pyne, 313 U.S. 127; Margaret E. Amory, 22 B.T.A. 1398, and The Almalgamated Dental Co., Ltd., 6 T.C. 1009 (No. 129). From a consideration of all the evidence we are of the opinion that from the time that Robert Colgate acquired all of the stock of the petitioner on February 3, 1940, and through the taxable years here in question, petitioner was engaged in carrying on a trade or business within the meaning of section 23 (a) (1) (A) of the Code. It is clear that throughout this period petitioner's activities were directed towards the realization of profit from the operation of petitioner's property and not for the pleasure and recreation of petitioner's sole stockholder. See Marshall Field, 26 B.T.A. 116, affirmed 67 Fed. (2d) 876. The fact that petitioner's property had not been operated at a profit for many years does not require a different conclusion. See Whitney v. Commissioner, 73 Fed. (2d) 589, 592; Israel O. Blake, 38 B.T.A. 1457, 1460; *183 Farish v. Commissioner, 103 Fed. (2d) 63; Lillie S. Wegeforth, 42 B.T.A. 633. It is also clear that prior to February 3, 1940, petitioner was not engaged in carrying on any trade or business but rather operated its property solely for the pleasure and recreation of its then stockholders. Respondent further argues that even though it be decided that petitioner was engaged in carrying on a trade or business, the expenses which petitioner seeks to deduct were not "ordinary and necessary expenses" incurred in the carrying on of trade or business. As stated by the Supreme Court in Welch v. Helvering, 290 U.S. 111, the word "ordinary" in this context does not mean that the payments must be normal or habitual in the sense that the same taxpayer will have to make them often. In Deputy v. Dupont, 308 U.S. 488, the Court elaborated further on this point, stating: * * * Ordinary has the connotation of normal, usual, or customary. To be sure an expense may be ordinary though it happens but once in the taxpayer's lifetime * * *. Yet the transaction which gives rise to it must be of common or frequent occurrence in the type of business involved *184 * * *. One of the extremely relevant circumstances is the nature and scope of the particular business out of which the expense in question accrued. * * * Whether an expenditure is directly related to a business and whether it is ordinary and necessary are doubtless pure questions offact in most instances. Commissioner v. Heininger, 320 U.S. 467, and Helvering v. Highland, 124 Fed. (2d) 556, 562. From the evidence here before us it appears that the greater part of petitioner's expenditures in 1940, 1941 and 1942 were "ordinary" in the sense that the term has been defined by the Supreme Court. The word "necessary" as used in the statute has been defined to mean "appropriate" and "helpful". Blackmer v. Commissioner, 70 Fed. (2d) 255; L. T. Alverson, 35 B.T.A. 482, 488, and Luther Ely Smith, 3 T.C. 696, 702. Considering the nature and scope of petitioner's business after February 3, 1940, it appears that these expenditures with certain exceptions, were "necessary". Although we are inclined to agree with respondent's argument that expenditures of some $25,000 by petitioner for improvements and new furnishings for the dwelling *185 house was perhaps greater than the rental income from the property warranted, we are not disposed, on the basis of the record before us, to substitute our judgment for that of the taxpayer in determining the amount which should have reasonably been expended for these purposes, and the consequent deductions allowable on account of interest, depreciation and insurance. We are, however, of the opinion that the sum of $110 paid by petitioner in 1941 to the Onteora Club as dues and assessments was a personal expense of petitioner's sole stockholder and no part of this payment may be deducted by petitioner as an expense paid or incurred in carrying on its trade or business. Louis Boehm, 35 B.T.A. 1106, 1109. We have found certain other expenditures not to have been ordinary and necessary business expenses. This we have done either because there is no evidence whatsoever upon which we could make a contrary finding, or because the evidence which we have indicates that certain of the expenditures were of a capital nature rather than deductible business expenses. In its 1941 and 1942 returns petitioner also sought to deduct net operating loss carryovers for the years 1939 and *186 1940. The pertinent provisions of the Internal Revenue Code are set forth below. [3]
We have already pointed out that prior to February 3, 1940 petitioner was not engaged in carrying on any trade or business and that its expenditures prior to that date were personal, family or living expenses of its stockholders, which were not allowable deductions by reason of section 24 (a) of the Code, supra. It follows that for the taxable year 1939 and for that part of 1940 prior to February 3, petitioner had no deductions allowed by Chapter 1 of the Code, except the deductions for 1939 and 1940 taxes which respondent allowed in the notice of deficiency. Therefore, except for the taxes allowed by respondent, petitioner, *187 in its 1941 and 1942 returns can not include in the computation of net operating loss carry-overs for 1939 and 1940 any part of its expenses in 1939 and any part of its expenses paid or incurred prior to February 3, 1940. Only those expenses paid or incurred after that date and found by us to have been ordinary and necessary business expenses may be included in the computation of the net operating loss carry-over for 1940. The petition in this cause alleges that, with respect to the calendar year 1941 respondent erroneously disallowed the deduction of a loss of $122.70 sustained on the sale of certain depreciable property. Inasmuch as petitioner has not pursued the point at the hearing or on brief, we must assume that petitioner has abandoned the point and we must sustain respondent's disallowance. Decision will be entered under Rule 50. Footnotes
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: (a) Expenses. - (1) Trade or Business Expenses. - (A) In General. - All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered, * * *. REGULATIONS 103: SEC. 19.23(a)-1. Business expenses. - Business expenses deductible from gross income include the ordinary and necessary expenditures directly connected with or pertaining to the taxpayer's trade or business, except the classes of items which are deductible under sections 23 (b) to 23 (s) inclusive, and the regulations thereunder. * * * REGULATIONS 111: SEC. 29.23(a)-1. Business expenses. - Business expense deductible from gross income include the ordinary and necessary expenditures directly connected with or pertaining to the taxpayer's trade or business, except the classes of items which are deductible under sections 23 (b) to 23 (z)↩. inclusive, and the regulations thereunder. * * * 2. SEC. 24. ITEMS NOT DEDUCTIBLE. (a) General Rule. - In computing net income no deduction shall in any case be allowed in respect of - (1) Personal, living, or family expenses; * * * * *↩
3. SEC. 23. Deductions from Gross Income. In computing net income there shall be allowed as deductions: * * * * *
(S) Net Operating Loss Deduction. - For any taxable year beginning after December 31, 1939, the net operating loss deduction computed under section 122. * * * * *
SEC. 122. Net Operating Loss Deduction. (a) Definition of Net Operating Loss. - As used in this section the term "net operating loss" means the excess of the deductions allowed * * *.↩