Roberts Dairy Company v. Commissioner.
Roberts Dairy Co. v. Commissioner
Docket No. 20442.
United States Tax Court
1950 Tax Ct. Memo LEXIS 62; 9 T.C.M. (CCH) 1000; T.C.M. (RIA) 50271; October 31, 1950
*62 In 1943 petitioner made a contribution to the National Tax Equality Association. This association was organized in the latter part of 1943 to conduct research activities relative to disparties in Federal and state tax statutes and to disseminate such information to civic organizations and representatives of business, to the public and to Federal and state governments. Held, such contribution is nondeductible in computing gross income under either section 23 (a) (1) (A) or 23 (q) (2), Internal Revenue Code. Harry R. Henatsch, Esq., 1501-1518 City Nat. Bank Bldg., Omaha, Neb., and Robert K. Adams, Esq., for the petitioner. George *63 E. Gibson, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: Respondent has determined deficiencies in excess profits tax for the years 1942 and 1943 of $20,574.19 and $54,384.69, respectively. The sole issue for determination is whether or not $750 paid to the National Tax Equality Association in 1943 is deductible from gross income under either section 23 (a) (1) (A) or 23 (q) (2), Internal Revenue Code. All other issues have been waived by petitioner. Part of the facts were stipulated and are so found. Findings of Fact Petitioner is a corporation organized under the laws of the State of Nebraska with its principal place of business at 2901 Cuming Street, Omaha, Nebraska. Its returns for 1943 were filed with the collector of internal revenue for the district of Nebraska. Petitioner is engaged in the dairy business and operates in a manner which is known in the trade as an "independent." It does not produce its own milk, but must purchase it from producers. In the years immediately prior to and including 1943 petitioner was faced with severe competition from dairies functioning in a cooperative *64 type of business organization. Petitioner had difficulty retaining its suppliers and customers because of the advantages offered them by the cooperatives. These advantages were made possible because of the stronger financial position of the cooperatives compared with petitioner, brought about to a large degree by their tax-exempt status under section 101 (12) and (13) of the Code. To meet the competition of the cooperatives, petitioner had the alternatives of changing its form of doing business to that of a cooperative type of organization; of placing before its customers, suppliers and interested persons, facts and statistics showing the tax advantage enjoyed by cooperatives, and thereby being able to better explain its competitive position; or, of ultimately realizing a tax status equal to that of the cooperatives. To obtain aid from the services proposed by the National Tax Equality Association in meeting these problems, petitioner paid $750 in October 1943 to the National Tax Equality Association (hereinafter referred to as NTEA), and subsequently received the bulletins, research publications and other literature distributed by NTEA. NTEA was incorporated under the laws of *65 the State of Illinois on October 11, 1943. It is a nonprofit organization supported by contributions entitling the contributor to membership for one year. Its articles of incorporation provide that the objects and purposes for which it was organized are: "* * * to conduct educational, scientific and research activities relative to disparities in federal and state tax statutes and other laws and regulations affecting business, and to disseminate such information to civil organizations and representatives of business affected thereby, to the public and to federal and state governments. The Corporation shall be non-sectarian, non-partisan, and no part of the net earnings, if any, of the Corporation shall inure to the benefit of any private shareholder or individual." The first regular meeting of the incorporators of NTEA was held November 18, 1943, at which time the members of the board of directors were nominated and elected. The first regular meeting of the board of directors of NTEA was held on November 19, 1943, at which time the constitution and by-laws were adopted and officers were elected. The remainder of 1943 constituted an organizational period during which time staff *66 personnel were employed and research was begun. Two or three bulletins were distributed during this period. NTEA operated under the charter granted in October 1943 until 1949 when the charter was amended to permit the urging of the elimination of tax disparties. While operating under the 1943 charter, bulletins and literature distributed were directed toward informing its members and the public of the tax disparities between private and cooperative business organizations. These bulletins were made available for further distribution by its members and suggestions to that effect were made by NTEA on attached order blanks. NTEA did not engage directly in lobbying activities, had no congressmen on its mailing list and did not request to appear before congressional committees considering changes in the tax statutes. Officials of NTEA did, however, appear before the Ways and Means Committee of the House of Representatives in 1947 at the Committee's request. In March 1946, NTEA, in one of its bulletins, asserted that the inquiry by this Committee concerning tax-exempt businesses was a direct result of the energy given that issue by NTEA. In an NTEA publication dated February 1, 1944, the *67 program of NTEA was to be one of dissemination to its members as well as to trade papers, periodicals, and newspapers of information prepared by its research division dealing with unequal taxation. It would also sponsor programs by speakers representing NTEA. It proposed to maintain a Washington counselor to represent the association and its members before congressional committees and other governmental agencies, as well as before state legislatures and other state, county and municipal bodies wherever tax problems arose. Exemption from Federal income tax was granted NTEA by the Commissioner under section 101 (6) of the Code on December 24, 1943. Upon the request of NTEA dated January 10, 1944, the Commissioner reconsidered his previous ruling and modified it to allow exemption from Federal income tax under section 101 (7). On November 19, 1943, a bill was introduced in the House of Representatives which on February 25, 1944, was enacted as the Revenue Act of 1943. Section 117 of the Act required organizations exempt from tax to file information returns. Publicity of NTEA gave credit to NTEA for the inclusion of this section in the bill as a result of NTEA's fact finding and publicity *68 having been successfully presented by its members to Congress. NTEA was organized and primarily operated from its inception for the carrying on of propaganda with the ultimate objective being a revision in the tax structure. Opinion The issue in this proceeding for our determination is whether or not a contribution of $750 paid to the National Tax Equality Association in 1943 is deductible from gross income as an ordinary and necessary business expense under section 23 (a) (1) (A)[1] of the Code, or in the alternative, deductible under section 23 (q) (2). [2]
*69 Contributions to organizations carrying on propaganda or otherwise attempting to influence legislation are nondeductible under section 23 (q) (2). (See Footnote 2). The Supreme Court in Textile Mills Securities Corp. v. Commissioner, 314 U.S. 326, has unequivocally applied that portion of article 23(q)-1 of Regulations 94, which in all material respects is the same as section 29.23(q)-1 [3] of Regulations 111, here applicable, to make nondeductible under section 23 (a) (1) (A) expenditures to an organization engaged in the activities set out in the regulation. See also, Mary E. Bellingrath, 46 B.T.A. 89. Upon this authority we come to the ultimate question for determination: Was this contribution expended for the exploitation of propaganda or the promotion or defeat of legislation? NTEA, the organization to which the contribution *70 was made, was incorporated in October 1943. Officers were elected on November 19, 1943. Its object, as we have found, was to disseminate information to the public and to Federal and state governments relating to tax disparities in which petitioner was vitally interested. The remainder of 1943 was essentially an organizational period with its activities being confined to starting research and to the publication of a few bulletins. Petitioner has failed to show wherein the purpose of the organization of NTEA was any different or that its activities or type of information disseminated was any different in 1943 than in later years operating under the same charter prior to 1949. This being the case, it appears to us that all of its activities adhered to the object of its organization and that the type of information disseminated in later years, which is in evidence, was the type intended upon its incorporation. That NTEA did not regard itself as an organization of the type exempt from income tax under section 101 (6) of the Code (contributions to which are deductible under section 23 (q) (2)), is clearly shown by its request to the Commissioner to change the exemption granted under section *71 101 (6) to exemption under section 101 (7) as a business league. Although this was done in January 1944, it appears to have been based on the same evidence and was part of the same correspondence begun in December 1943. Whatever the purpose for this request we can not say, but it does establish that NTEA did not regard itself as an organization of the type exempt under section 101 (6). On November 18, 1943, a bill was introduced in the House of Representatives, which was referred to the Ways and Means Committee, and was later enacted on February 25, 1944, as the Revenue Act of 1943. Section 117 of this Act, as passed, was identical with the bill as introduced which required organizations including cooperatives exempt from tax under section 101 of the Code to file information returns. NTEA, in its publicity, took credit for the inclusion of this section as a result of its fact finding and publicity having been successfully presented to Congress by members of NTEA but not by NTEA directly. In view of the fact that NTEA was organized and operated for such a short period of time in 1943 consideration is given to evidence before us dealing with years subsequent to 1943, merely for clarification *72 of the nature of its activities and pattern of its program. However, we do not base our conclusion entirely upon this evidence. As early as February 1944, we have found, NTEA proposed to distribute propaganda to its members as well as to trade papers, periodicals, and newspapers. It would also sponsor programs by speakers representing NTEA. A counselor would be maintained in Washington, D.C., to represent the association and its members before congressional committees. In 1946 NTEA asserted that inquiry by the Ways and Means Committee of the House of Representatives concerning the tax-exempt businesses was a direct result of its energy. In 1947 officials of NTEA appeared before the Ways and Means Committee to present its factual information. Although NTEA engaged in no paid "lobbying" activities nor distributed the propaganda directly to the members of Congress, it makes little practical difference whether NTEA did it directly or merely supplied the ammunition which was further distributed by its members. The end result was the same and the propaganda was just as effective in achieving the ultimate objective. The efforts of NTEA are directed against the tax advantages enjoyed *73 by cooperatives and similar business organizations. Since these advantages were acquired through tax statutes specifically granting them, a change must come by way of a revision of the statute and this can be accomplished only by legislation. Hence, the only reasonable purpose for the existence of NTEA is to influence legislation and contributions to it were used for that purpose. In the face of section 101 granting the exemptions, petitioner's contention that revision can be accomplished by means other than legislation does not seem plausible. This being the case we can only conclude that the objectives of its activities were the carrying on of propaganda or otherwise attempting to influence legislation under section 23 (q) (2) and the promotion or defeat of legislation or the exploitation of propaganda within the prohibition of section 29.23(q)-1 of Regulation 111. Therefore, the expenditure here in question is nondeductible under either section 23 (q) (2) or 23 (a) (1) (A). Petitioner has cited several cases as authority for allowing this deduction as a business expense which we think inapplicable. In Luther Ely Smith, 3 T.C. 696, the Court held that no legislation *74 was involved inasmuch as an amendment to the Constitution of the State of Missouri was voted by the people and became self-operative without approval of the legislature. In Los Angeles & Salt Lake Railroad Co., 18 B.T.A. 168, and the other cases cited by petitioner, which were based on contributions to the Railway Executives Association, as well as Lucas v. Wofford, 49 Fed. (2d) 1027, and Independent Brewing Co. of Pittsburgh, 4 B.T.A. 870, the decisions indicated that to be nondeductible the expenditure must have been for illegal purpose. These cases antedate the cases of Textile Mills Securities Corp. v. Commissioner, supra, and Mary E. Bellingrath, supra, both of which disallowed expenditures made for legitimate purposes, but which fell within the prohibition of the phraseology of the regulations. Since the regulations have determined that expenditures made for the exploitation of propaganda or the promotion or defeat of legislation are not deductible as business expenses, we find it unnecessary to determine whether or not these expenditures were ordinary or necessary expenses. Decision will be entered for the *75 respondent. Footnotes
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing the net income there shall be allowed as deductions: (a) Expenses. - (1) Trade or Business Expenses. - (A) In General. - All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; * * *. ↩
2. (q) Charitable and Other Contributions by Corporations. - In the case of a corporation, contributions or gifts payment of which is made within the taxable year to or for the use of: * * *
(2) A corporation, trust, or community chest, fund or foundation, created or organized in the United States or in any possession thereof or under the law of the United States, or of any State or Territory, or of the District of Columbia, or of any possession of the United States, organized and operated exclusively for religious, charitable, scientific, veteran rehabilitation service, literary, or educational purposes * * *, no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation; * * *.↩
3. SEC. 29.23 (q)-1. Contributions or Gifts by Corporations. - * * * Sums of money expended for lobbying purposes, the promotion or defeat of legislation, the exploitation of propaganda, including advertising other than trade advertising, and contributions for campaign expenses are not deductible from gross income.↩