LUTHER ELY SMITH, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 109631. Promulgated May 1, 1944.

*Harold C. Hanke*, Esq., for the petitioner.

*Richard A. Jennings*, Esq., and *J. Marvin Kelley*, Esq., for the respondent.

OPINION.

KERN, *Judge:* *First issue.*—The facts out of which this issue arose are undisputed.

Section 107, I. R. C., added by section 220 of the Revenue Act of 1939, provides in part that in the case of the receipt of compensation for personal services rendered by an individual "covering a period of five calendar years, or more, from the beginning to the completion of such services" at least 95 percent of which is paid only on completion of such services, and which is required to be included in the gross income of such individual for any taxable year after December 31, 1938, the tax attributable to such compensation shall not be greater than the aggregate of the taxes attributable thereto had it been received in equal portions in each of the years included in such period.

The parties here agree that the facts meet all the requirements of section 220, except the period of time over which the services are rendered. The respondent argues that although the services were admittedly rendered over a period of five full years, or sixty months, they did not cover a period of five calendar years or more, since they began May 16 of 1934 and ended May 22 of 1939, which period, in respondent's view, covers only the four calendar years of 1935, 1936, 1937, and 1938, ignoring those months of 1934 and 1939 which totaled more than a year.

Respondent in his regulation has interpreted the term used in the statute, "calendar years," to mean a year beginning January 1 and ending December 31, and petitioner challenges the correctness of that interpretation.

The regulation seems to be based on the assumption that the term "calendar year" can mean only the period beginning January 1 and ending on December 31. And that definition is, indeed, one meaning of the term. But the phrase does not have, in law, one fixed and definite meaning. It may mean the period from January 1 to the succeeding December 31, or it may mean a period of 365 days, or in leap year 366, or 12 calendar months, depending upon its use in the

context in which it appears. The courts have held in a number of cases that, ordinarily, and in common acceptation, a calendar year means 365 days, except leap year, and is composed of 12 calendar months. *Shaffner* v. *Lipinsky*, 194 N. C. 1; 138 S. E. 418; *Geneva Cooperage Co.* v. *Brown*, 124 Ky. 16; 98 S. E. 279.

The Senate Finance Committee, in its discussion of this measure, used the expression "five years" throughout, no mention being made of calendar years, and the whole tenor of that discussion leaves no doubt of their intention to relieve all those whose services extended over a period of five years.

The phrase "calendar year" as used in other parts of the internal revenue laws is generally used in contrast to a fiscal year, and in that context it can not be doubted that it refers to the period January 1 to December 31. But in section 220 it is not used in contradistinction to a fiscal year. The language in which it appears, as well as the legislative history of the provision, seems to require that, as used in section 220, it must be construed to mean a year of 365 days. The statute itself provides that the "period of five calendar years" is to be "from the beginning to the completion of such services." It seems obvious therefore that the period may begin on any day of the year and not, perforce, on January 1. *John Bell Keeble, Jr.*, 2 T. C. 1249. The respondent erred in his refusal to give effect to section 107 in computing petitioner's tax for 1939.

*Second issue.*—Petitioner claims the right to deduct his contribution of $2,500 to the Missouri Institute for the Administration of Justice on two grounds—under section 23 (a) (1), as an ordinary and necessary expense paid during the taxable year in carrying on his trade or business; and under section 23 (o) (2) of the Internal Revenue Code as a contribution to a corporation organized and operated exclusively for educational purposes, no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda or otherwise attempting to influence legislation.

The latter contention is the more easily disposed of. We do not think it can be said that the organization here in question was organized and operated exclusively as an educational organization. It was organized and operated to bring about an amendment to the Constitution of Missouri so as to permit the selection of judges of certain courts by a different method than had theretofore prevailed. The educational activities in which it engaged so successfully were simply one of the means by which the end for which it was organized could be achieved. It went further than mere education; it utilized that education to achieve the purpose for which it was organized. To hold this organization to have been organized and operated exclusively for

educational purposes would be to distort the fundamental meaning of the term "educational" and enlarge the applicability of section 23 (o) far beyond its intended scope. The deduction claimed under this section was properly denied.

The application of section 23 (a) (1) (A) to the peculiar facts surrounding this expenditure presents a more difficult problem. The evidence shows that the law business of petitioner, as well as of other lawyers in St. Louis, generally, was adversely affected by the lack of confidence of a considerable segment of the public, including clients of petitioner, in the integrity of the courts. Public interest in and aversion to the close relationship which existed between the politicians and the judges was keen. Editorials and cartoons in all St. Louis newspapers, depicting and deploring the political control of the courts, gave wide publicity to the existing state of affairs, and it was a matter of common public belief that the administration of justice by the courts was subordinate to the cultivation of helpful political associations.

Petitioner had been a member of the St. Louis Bar Association committee which had studied the problem of the selection and tenure of judges for a number of years, and the plan evolved by the institute had the full support of the Bar Association. It seemed to petitioner to be the best available plan for freeing the courts of political control and assuring the selection of capable judges, thus restoring public confidence in the administration of justice, a condition which he considered essential to his continued success in the practice of law. He made his contribution to the institute in the hope of bringing about an improvement in the administration of justice and also in his own business.

It should be noted that the institute engaged in no lobbying of any kind before any legislative body. No legislation was needed or involved in its plan. It contemplated an amendment to the constitution, proposed by the initiative of the people, voted upon at a general election, and becoming selfoperative thirty days thereafter, without the necessity of any action or approval by either the legislature or the governor.

The statutory requirements that an expense, to be deductible, must be ordinary and necessary seem to us to be met by the facts in the instant case, when examined in the light of the decided cases on the subject.

In the sense in which the word "necessary" has been defined as "helpful or appropriate," this expenditure was necessary. *Welch* v. *Helvering*, 290 U. S. 111; *Cannon Valley Milling Co.*, 44 B. T. A. 763; *Edw. J. Miller*, 37 B. T. A. 830; *L. T. Alverson*, 35 B. T. A. 482. The fact that it was not compulsory, in that petitioner was under no legal

obligation to make it, is not material.  Petitioner makes the interesting suggestion that he may have been under some compulsion as a member of the bar of the Supreme Court of Missouri, one of the canons of ethics of which adjures its member to assist in bringing about improvement in the method of selecting judges.  But, aside from any such obligation, we think this expenditure was necessary, within the meaning of the statute, since it was beneficial and appropriate under the circumstances.  Petitioner and other contributors similarly situated testified that they considered it necessary to their business welfare to support the movement inaugurated by the institute, and we are reluctant to override their judgment, under the circumstances.

Whether it was "ordinary," or not, has been somewhat more difficult to determine.  The Supreme Court, in *Welch* v. *Helvering*, 290 U. S. 111, has indicated that an expense need not be of an habitual or recurring nature, in order to be considered ordinary.  It has also said there that, although a payment may be unique in the life of an individual, if it is ordinary in the life of the group of which he is a part it may still be allowable as an ordinary expense.

It is an ordinary thing for lawyers to take an active personal and financial interest in movements designed to improve the processes of justice.  This is so not only by reason of their moral obligation, as members of the bar, but because the administration of justice is the business of lawyers, and the measure of their professional success depends upon the integrity and efficiency of those processes.  Legal societies and organizations, which are simply lawyers acting in concert, quite generally initiate such movements.  So it is a common activity of bar associations throughout the country to conduct pre-primary nonpartisan polls among their members, the purpose of which is to secure, by recommending to the electorate, the best available judges for the courts.  Such polls are financed by the bar associations, which, in turn, are financed by the lawyers who make up their membership through the payment of dues.  Such dues are deductible as ordinary and necessary business expenses.  See art. 23 (a) 5, Regulations 101.

We have heretofore allowed the deduction of expenses which seem indistinguishable in all essential particulars from the situation confronting us here.  In *Independent Brewing Co. of Pittsburgh*, 4 B. T. A. 870, the petitioner was allowed to deduct a contribution made to a national brewers' association which maintained offices in Washington, D. C., and used the particular contribution in question to conduct litigation seeking to establish the unconstitutionality of the Eighteenth Amendment to the Constitution of the United States.

Cases upholding the deductibility of contributions to trade organizations organized to promote the interests of the particular trade or

business group to which the respective petitioners belonged are too numerous to cite. The "business" of this petitioner was a component element of the administration of justice, and a contribution by him to an organization which promotes the interest of this "business" by improving the administration of justice should likewise be deductible.

It is impossible to perceive any reasons of public policy for disallowing contributions to the institute. In the absence of some such reason, since it bears a proper relationship to the petitioner's business, we are of the opinion, in view of all the facts and circumstances surrounding it, that petitioner's contribution to it is deductible.

*Third and fourth issues.*—The evidence before us relating to petitioner's contributions to the Civil Liberties Committee and the International Committee for Political Prisoners is altogether insufficient to enable us to say that respondent was in error in denying the deduction. We have before us no evidence covering the purpose and activity, in the conjunctive, of either organization. These are matters concerning which we do not have judicial knowledge and in regard to which we are required to limit our consideration to the evidence properly presented. That evidence being conspicuously inadequate on these issues, the respondent's determination will be sustained.

*Fifth issue.*—Petitioner's contribution to the St. Louis League of Women Voters is deductible as a contribution to a corporation organized and operated exclusively for educational purposes. *Charles W. Dahlinger*, 20 B. T. A. 176, 181. The evidence discloses that neither the St. Louis league nor the national league, with which it was affiliated, had any provision in their respective constitutions in 1939 for legislative activity. Such appearances as the St. Louis league may have made before legislative bodies (and it was not definitely established that any were made in the tax year in question) did not constitute any substantial part of their activity. We think these departures from the facts shown to have existed in *Henriette T. Noyes*, 31 B. T. A. 121, decisively distinguish this case, and bring it within the rule of the *Dahlinger* case, *supra*.

*Sixth issue.*—Petitioner claims a deduction in the amount of $3.50 sustained as a result of his having paid that amount to the St. Louis Public Library as damages to a book borrowed by him, left on a bus, and later returned to the library in a badly damaged condition by an unidentified person. The damage was apparently caused by the book having been dropped in water. The deduction is claimed under section 23 (e) (3) of the Internal Revenue Code, which allows a deduction for loss "of property not connected with trade or business, if the loss arises from fires, storms, shipwreck, or other casualty."

The contract between petitioner and the public library is not shown. We may assume that the loan of the book was a bailment for the ex-

clusive benefit of the bailee and that petitioner would be liable to the library for the payment of damages to the book arising from slight negligence on his part. By leaving the book unguarded in a public conveyance petitioner was guilty of negligence. The payment of $3.50 to the library was apparently in satisfaction of such damages. This payment was made to the owner of property by a gratuitous bailee for damages to the property caused by the bailee's negligence. The amount thus paid is not a loss of property arising from casualty within the meaning of the statute, and the petitioner is not entitled to the deduction claimed.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

OPPER, *J.*, concurring: I agree that on the first point this proceeding is indistinguishable from the *Keeble* case, which I see no compelling reason for overruling now. But I do not think the result is otherwise supportable. Not only does it require that we eliminate the word "calendar" from the statute, an amendment I think beyond our province under the familiar rule that words employed in legislation are not lightly to be taken as meaningless, but the prevailing view also overlooks what seems to me a fairly evident purpose in the use of that word, that is, an intention to make it consistent with the normal taxable year, which, especially in the case of individuals, is likely to be the calendar year. See Internal Revenue Code, sec. 48. Thus, a taxpayer who comes squarely within the statutory definition with services extending over "a period of" exactly "five calendar years," for example, would be at a tax disadvantage compared with another whose services covering a period of similar length fell into six taxable years and thus permitted allocation to each of the years included in "such period," or a division of the compensation into six parts instead of five.