CAMMARANO ET UX. *v.* UNITED STATES.

No. 29.   Argued November 19, 1958.—Decided February 24, 1959.*

*Frederick Bernays Wiener* argued the cause for petitioners in No. 29.   With him on the brief was *Clinton M. Hester.*

---

*Together with No. 50, *F. Strauss & Son, Inc.,* of Arkansas v. Commissioner of Internal Revenue,* on certiorari to the United States Court of Appeals for the Eighth Circuit.

*E. Chas. Eichenbaum* argued the cause for petitioner in No. 50. With him on the brief were *Leonard L. Scott* and *W. S. Miller, Jr.*

*Oscar H. Davis* argued the causes for respondents. On the brief were *Solicitor General Rankin, Assistant Attorney General Rice, Joseph F. Goetten* and *Myron C. Baum.*

*Hart H. Spiegel* filed a brief for the Bay Cities Transportation Co., as *amicus curiae.*

MR. JUSTICE HARLAN delivered the opinion of the Court.

These cases, coming to us from two different Circuits, present identical issues, and may appropriately be dealt with together in one opinion. The issues involve the interpretation and validity of Treas. Reg. 111, § 29.23 (o)–1 and § 29.23 (q)–1 as applied by the courts below to deny deduction as "ordinary and necessary" business expenses under § 23 (a)(1)(A) of the Internal Revenue Code of 1939 [1] to sums expended by the respective taxpayer petitioners in furtherance of publicity programs designed to help secure the defeat of initiative measures then pending before the voters of the States of Washington and Arkansas.

The Treasury Regulations in question each provides in pertinent part that no deduction shall be allowed to "sums of money expended for lobbying purposes, the promotion

---

[1] That section (26 U. S. C. § 23 (a)(1)(A)) provides in pertinent part:

"§ 23. Deductions from gross income. In computing net income there shall be allowed as deductions:

"(a) Expenses.

"(1) Trade or Business Expenses.

"(A) In General. All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business . . . ."

or defeat of legislation, the exploitation of propaganda, including advertising other than trade advertising . . . ." [2] Both Courts of Appeals held that these provisions render nondeductible sums paid by petitioners to organizations which expended them in extensive publicity programs designed to persuade the voters to cast their ballots against state initiative measures, even though the passage of those measures would have seriously affected, or indeed wholly destroyed, the taxpayers' businesses—and that so interpreted the Regulations are a valid exercise of the Commissioner's rule-making power. We granted certiorari because of the recurring nature of the question, and because of its importance to the proper administration of the Internal Revenue laws. 355 U. S. 952; 356 U. S. 966.

A brief review of the facts in the two cases is necessary to an understanding of the issues.

No. 29: In 1948 petitioners William and Louise Cammarano, husband and wife, jointly owned a one-fourth interest in a partnership engaged in the distribution of beer at wholesale in the State of Washington. The partnership was a member of the Washington Beer Wholesalers Association. In December 1947 the Association had established a trust fund as a repository for assessments collected from its members to help finance a statewide publicity program urging the defeat of "Initiative to the Legislature No. 13," a measure to be submitted to the electorate at the general election of November 2, 1948, which would have placed the retail sale of wine and beer in Washington exclusively in the hands of the State.

---

[2] Only § 29.23 (o)–1, which reads on individuals, is involved as to petitioners Cammarano, and only § 29.23 (q)–1, reading on corporations, as to petitioner F. Strauss & Son, Inc. Because the language and effect of the two Regulations are in all relevant respects identical they will be discussed throughout this opinion as if they were one.

During 1948 petitioners' partnership paid to the trust fund $3,545.15, of which petitioners' pro rata share was $886.29. The trust fund collected a total of $53,500, which was turned over to an Industry Advisory Committee organized by wholesale and retail wine and beer dealers, which in turn expended it as part of contributions totaling $231,257.10 for various kinds of advertising directed to the public, none of which referred to petitioners' wares as such and all of which urged defeat of Initiative No. 13.[3] The initiative was defeated.

In preparing their joint income tax return for 1948, petitioners deducted as a business expense the $886.29 paid to the Association's trust fund as their share of the partnership assessment. The deduction was disallowed by the Commissioner, and petitioners paid under protest the additional sum thus due and sued in the District Court for refund. That court ruled that the payments made to the trust fund were "expended for . . . the . . . defeat of legislation" within the meaning of Treas. Reg. 111, § 29.23 (o)–1 and were therefore not deductible as ordinary and necessary business expenses under § 23 (a)(1)(A) of the Internal Revenue Code of 1939. The Court of Appeals affirmed, holding the Regulation applicable and valid as applied. 246 F. 2d 751.[4]

---

[3] A typical advertisement paid for by the Industry Advisory Committee, signed by "Men & Women Against Prohibition," begins "We intend to Vote Against Initiative 13—because it would mean a return to the speakeasy, the bootlegger, the gangster—and, finally, state-wide PROHIBITION! We urge our friends and neighbors to do likewise."

[4] The Court of Appeals alternatively held that judgment in favor of the Commissioner was required by a trial court finding that petitioners Cammarano had failed to show that passage of the initiative would have impaired their partnership's business as a beer distributor. 246 F. 2d, at 754. This ground of decision is not strongly defended by the Government in this Court, and on our view of the principles which control it need not be considered.

No. 50: Petitioner F. Strauss & Son, Inc., is a corporation engaged in the wholesale liquor business in Arkansas. In 1950 an initiative calling for an election on statewide prohibition was placed on the ballot to be voted on in the state general election on November 7, 1950. In May of that year Strauss, together with eight other Arkansas liquor wholesalers, organized Arkansas Legal Control Associates, Inc., as a means of coordinating their efforts to persuade the voters of Arkansas to vote against the proposed prohibition measure. Between May 30 and November 30, 1950, Arkansas Legal Control Associates collected a total of $126,265.84, which was disbursed for various forms of publicity concerning the proposed Act.[5] Strauss' contribution amounted to $9,252.67.

The initiative measure was defeated in the November election. On its 1950 income tax return Strauss deducted the $9,252.67 as a business expense. The Commissioner disallowed the deduction and Strauss filed a timely petition in the Tax Court seeking a redetermination of the deficiency asserted. That court upheld the action of the Commissioner in disallowing the claimed deduction, and the Court of Appeals unanimously affirmed. 251 F. 2d 724.

Since 1918 regulations promulgated by the Commissioner under the Internal Revenue Code have continuously provided that expenditures for the "promotion or defeat of legislation . . . ," or for any of the other purposes specified in the "corporate" Regulation now before us, are not deductible from gross corporate income; and

---

[5] A typical advertisement, which ran in all Arkansas daily and weekly newspapers, and which shows as its sponsor "Arkansas Against Prohibition," begins:

"What Does 'One Quart' Prohibition REALLY MEAN? There's nothing like it anywhere . . . it's novel . . . it's unique. But it's sinister . . it's a plan to destroy the strictly-regulated alcohol beverage business and to turn that business over to the bootlegger."

since 1938 regulations containing identical language have forbidden such deductions from individual income.[6] During this period of more than 40 years these regulatory provisions have been before this Court on only one occasion. In *Textile Mills Securities Corp.* v. *Commissioner*, 314 U. S. 326, it was held that the Commissioner properly disallowed the deduction of sums paid by a corporation to a publicist and two legal experts employed to help secure the passage of legislation designed to secure the return of certain properties in this country seized during World War I under the provisions of the Trading With the Enemy Act. This holding was squarely based on the regulatory provisions now embodied in Treas. Reg. 111, § 29.23 (q)–1, which were found valid and applicable to the facts involved in that case, although the very busi-

---

[6] Article 143 of Treas. Reg. 33 (1918 ed.) denied deductibility as ordinary and necessary business expenses to corporate expenditures for "lobbying purposes, the promotion or defeat of legislation, the exploitation of propaganda . . . ." The prohibition against corporate deduction of such expenditures first appears in its present form in Art. 562 of Treas. Reg. 45 (1919 ed.), promulgated under the Revenue Act of 1918. Thereafter it so appears continuously without change. See Art. 562 of Treas. Reg. 45 (1920 ed.), 62, 65, and 69, promulgated under the Revenue Acts of 1918, 1921, 1924, and 1926, Art. 262 of Treas. Reg. 74 and 77, promulgated under the Revenue Acts of 1928 and 1932, Art. 23 (o)–2 of Treas. Reg. 86, promulgated under the Revenue Act of 1934, Art. 23 (q)–1 of Treas. Reg. 94 and 101, promulgated under the Revenue Acts of 1936 and 1938, §§ 19.23 (q)–1, 29.23 (q)–1, and 39.23 (q)–1 of Treas. Reg. 103, 111, and 118, respectively, promulgated under the Internal Revenue Code of 1939.

The prohibition against individual deductibility of such expenditures first appears in Art. 23 (o)–1 of Treas. Reg. 101, promulgated under the Revenue Act of 1938, and thereafter in §§ 19.23 (o)–1, 29.23 (o)–1, and 39.23 (o)–1 of Treas. Reg. 103, 111, and 118, respectively, promulgated under the Internal Revenue Code of 1939.

In the proposed Income Tax Regulations under the 1954 Code the prohibitions are consolidated in § 1.162–15.

ness of the taxpayer seeking the deduction was the direction of the publicity program in the course of which the expenditures were made.

Petitioners suggest that *Textile Mills* is not dispositive of the present cases, either as to the applicability of the Regulations upon the facts disclosed by these records or as to the validity of those Regulations under the statute if they are found to be applicable. Essentially, petitioners' contentions are (1) that the Regulations cannot properly be construed as applicable to expenditures made in connection with efforts to promote or defeat the passage of legislation by persuasion of the general public as opposed to direct influence on legislative bodies, that is "lobbying"; (2) that in any case the Regulations are inapplicable to expenditures made in connection with initiative measures; and (3) that if construed as applicable to the facts here presented the Regulations are invalid as contrary to the plain terms of § 23 (a)(1)(A) of the 1939 Code and possibly as unconstitutional under the First Amendment.

We need not be long detained by the question of the applicability of the Regulations to petitioners' expenditures. First, we see no justification for reading into these regulatory provisions the implied exceptions which petitioners would have us there find. We cannot accept petitioners' argument that *Textile Mills* should be read as limiting such provisions to direct dealings with legislators, insidious or otherwise. The deductions whose propriety was before the Court in that case were for expenditures, characterized by the Court of Appeals as being for "matters of publicity, 'including the making of arrangements for speeches, contacting the press, in respect of editorial comments, and news items,'" and for the preparation of "brochures" involving "a comprehensive study of the history of the treatment of persons and property in war," 117 F. 2d 62, 65, 63, all designed to influence

the opinions of the general public.[7]   Apart from *Textile Mills,* the Courts of Appeals have uniformly applied these Regulations to expenditures for publicity directed to the general public on legislative matters.   See, *e. g., Revere Racing Assn.* v. *Scanlon,* 232 F. 2d 816 (C. A. 1st Cir.); *American Hardware & Eq. Co.* v. *Commissioner,* 202 F. 2d 126 (C. A. 4th Cir.); *Roberts Dairy Co.* v. *Commissioner,* 195 F. 2d 948 (C. A. 8th Cir.); *Sunset Scavenger Co.* v. *Commissioner,* 84 F. 2d 453 (C. A. 9th Cir.). Petitioners' reading of these Regulations would make all but the reference to "lobbying" pure surplusage.   We think that the Regulations must be construed to mean what they say—that not only lobbying expenses, but also sums spent for "the promotion or defeat of legislation, the exploitation of propaganda, including advertising other than trade advertising" are nondeductible.[8]

Likewise unpersuasive is petitioners' suggested distinction between expenses incurred in attempting to promote or defeat legislation pending before legislatures and those incurred in furthering or combatting an initiative measure.   We think that initiatives are plainly "legislation" within the meaning of these Regulations.   Had the

---

[7] Petitioners Cammarano suggest that in fact "lobbying" was involved in *Textile Mills* because of the activities of one Mondell whose services had also been engaged by the petitioner there.   But the opinion of the Court of Appeals shows that none of the payments made to Mondell were involved in the litigation (see 117 F. 2d, at 64), and the opinion of this Court makes no reference to any of Mondell's activities.

[8] Petitioners point to *United States* v. *Rumely,* 345 U. S. 41, and *United States* v. *Harriss,* 347 U. S. 612, where this Court interpreted the term "lobbying" in a congressional resolution and in the Federal Regulation of Lobbying Act, 2 U. S. C. §§ 261–270, to mean only representations and communications made directly to Congress and its members concerning pending or proposed legislation.   These cases do not advance petitioners' cause, since the regulatory provisions here explicitly embrace more than "lobbying."   Cf. *United States* v. *Rumely, supra,* at 47.

measures involved in these cases been passed by the people of Washington and Arkansas they would have had the effect and status of ordinary laws in every respect. The Constitutions of the States of Washington and Arkansas both explicitly recognize that in providing for initiatives they are vesting legislative power in the people.[9]  Every court which has considered the question has found these provisions to be fully as applicable to initiatives and referendums as to any other kind of legislation.  See *Revere Racing Assn.* v. *Scanlon, supra; Old Mission Portland Cement Co.* v. *Commissioner,* 69 F. 2d 676, affirmed on other issues, 293 U. S. 289; *Mosby Hotel Co.* v. *Commissioner,* decided October 22, 1954, P–H 1954 TC Mem. Dec. ¶ 54,288; *McClintock-Trunkey Co.* v. *Commissioner,* 19 T. C. 297, reversed on other issues, 217 F. 2d 329 (involving payments, like those of petitioners Cammarano, made to the Washington Beer Wholesalers Association in connection with "Initiative to the Legislature No. 13").

A contrary reading of the Regulations would, indeed, be anomalous, for it would mean that expenses of publicity campaigns directed to the public to influence it in turn to persuade its legislative representatives to vote for or against pending bills would be encompassed by the Regulations and denied deductibility, whereas a less-

---

[9] Amendment 7 of the Constitution of the State of Washington provides in pertinent part:

"Art. 2, Sec. 1. *Legislative Powers, Where Vested*—The legislative authority of the state of Washington shall be vested in the legislature, consisting of a senate and house of representatives, which shall be called the legislature of the State of Washington, but the people reserve to themselves the power to propose bills, laws, and to enact or reject the same at the polls, independent of the legislature . . . ."

Amendment 7 of the Arkansas Constitution contains a virtually identical provision.

diluted form of persuasion and influence, directed to the voters as legislators, would be left at large so far as the Regulations are concerned. We see no reason to give so artificial and strained a construction to the pertinent language.[10]

The cornerstone of petitioners' argument is that Treas. Reg. 111, § 29.23 (o)–1 and § 29.23 (q)–1 are invalid if interpreted to apply to the expenditures here at issue. It is contended that sums expended by a taxpayer to preserve his business from destruction are deductible as ordinary and necessary business expenses under the Code as a matter of law, and that therefore a regulation purporting to deny deductibility to such expenditures is plainly contrary to the statute and *ipso facto* invalid. Petitioners rely upon *Commissioner* v. *Heininger*, 320

---

[10] Petitioners place heavy reliance on the Commissioner's acquiescence until 1958 in a 1944 decision of the Tax Court allowing deduction to expenditures—found otherwise to qualify under § 23 (a)(1)(A) of the 1939 Code—incurred by a taxpayer in connection with a self-operative amendment to the Missouri Constitution, on the ground that "no legislation was needed or involved." *Smith* v. *Commissioner*, 3 T. C. 696. Whether or not under the Regulations here at issue a distinction can rationally be drawn between a popularly enacted constitutional amendment and an initiative, we do not see how the fact that the Tax Court and the Commissioner for a period made such a distinction, compare *Smith* v. *Commissioner*, *supra*, with *McClintock-Trunkey Co.* v. *Commissioner*, 19 T. C. 297, reversed on other issues, 217 F. 2d 329, helps petitioners' case, as the Commissioner and the Tax Court have been entirely consistent in their position that expenditures connected with initiatives—as in the present cases—are not deductible.

The Tax Court appears to have modified its view since the *Smith* case even as to expenditures made in connection with constitutional amendments. See *Mosby Hotel Co.* v. *Commissioner*, decided October 22, 1954, P-H 1954 TC Mem. Dec. ¶ 54,288. And the Commissioner has recently withdrawn his acquiescence in the *Smith* decision. See Rev. Rul. 58–255, 1958–1 Cum. Bull. 91.

U. S. 467, where this Court held that attorney's fees incurred by a mail-order dentist in resisting a postal fraud charge which would have ended his business were deductible as an ordinary and necessary business expense.

We do not think that *Heininger* governs the present cases, nor that it establishes as broad a rule of law as petitioners suggest. In *Heininger* this Court held no more than that expenditures without which a business enterprise would inevitably suffer adverse effects, and the granting of deductibility to which would frustrate no "sharply defined national or state policies," 320 U. S., at 473 (see also *Commissioner* v. *Sullivan*, 356 U. S. 27), were deductible as ordinary and necessary business expenses.under the statute.[11]   Here the deductions sought are prohibited by Regulations which themselves constitute an expression of a sharply defined national policy, further demonstration of which may be found in other sections of the Internal Revenue Code.[12]

As was said in *Textile Mills*, "the words 'ordinary and necessary' are not so clear and unambiguous in their meaning and application as to leave no room for an interpretative regulation.   The numerous cases which have come to this Court on that issue bear witness to that." 314 U. S., at 338.   In the present cases there is before us regulatory language of more than 40 years' continuous duration expressly providing that sums expended for the activities here involved shall not be considered an ordinary and necessary business expense under the statute. The provisions of the Internal Revenue Code which underlie the Regulations have been repeatedly re-enacted by the Congress without the slightest suggestion that the

---

[11] The Court noted that in judging the issues before it "we do not have the benefit of an interpretative departmental regulation defining the application of the words 'ordinary and necessary' to the particular expenses here involved."   320 U. S., at 470.

[12] See p. 512, *post*.

policy expressed in these regulatory measures does other than precisely conform to its intent.[13]

In 1934 the Court of Appeals for the Ninth Circuit denied deduction to expenses incurred in connection with a referendum which would, if passed, have increased the taxpayer's business. *Old Mission Portland Cement Co. v. Commissioner, supra.*[14] And in 1936 the same court in *Sunset Scavenger Co. v. Commissioner, supra,* reversed the Board of Tax Appeals to hold that the regulatory language now before us, through repeated re-enactment by Congress of the underlying legislation, already had acquired the force of law, and applied it to deny deductibility to expenditures made by an incorporated association of garbage collectors for a publicity program directed to the general public urging the defeat of legislation which would have injured the business of the Association's membership. The court recognized that the Board of Tax Appeals had twice previously held similar expenditures deductible so long as not made for an illegal purpose,[15] but pointed out that in both of those cases the effect of the Regulation had been entirely disregarded, and that

[13] See Note 6, *supra.*

[14] The suggestion of petitioners Cammarano that the decision in that case turned on factors of the kind involved in *McDonald v. Commissioner,* 323 U. S. 57, is contradicted by the statement of the Court of Appeals concerning *Old Mission* in *Sunset Scavenger Co. v. Commissioner,* 84 F. 2d, at 457.

[15] *G. T. Wofford v. Commissioner,* 15 B. T. A. 1225; *Los Angeles & Salt Lake R. Co. v. Commissioner,* 18 B. T. A. 168. Cf. *Lucas v. Wofford,* 49 F. 2d 1027, where a petition by the Commissioner for review of the decision in *G. T. Wofford, supra,* was denied upon a finding that the expenditures involved were not made "to secure the passage or defeat of any legislation." 49 F. 2d, at 1028.

After this Court's decision in *Textile Mills* the Board of Tax Appeals recognized that the Regulation was applicable to expenditures incurred in a "proper and legal attempt to prevent [business] injury" by endeavoring to secure the defeat of legislation. *Bellingrath v. Commissioner,* 46 B. T. A. 89, 92.

they were therefore not sound authority. Three years later the Congress, in the face of these decisions, again re-enacted without change in the 1939 Code the "ordinary and necessary" business expense section.

It is also noteworthy that Congress, in its 1954 re-enactment of the Internal Revenue Code, again adopted the "ordinary and necessary" provision without substantive change,[16] following consistent rulings by the courts subsequent to the 1939 re-enactment holding these Regulations applicable to sums spent in efforts to persuade the general public of the desirability or undesirability of proposed legislation affecting the taxpayer's business. See *Textile Mills; American Hardware & Eq. Co.* v. *Commissioner, supra; Roberts Dairy Co.* v. *Commissioner, supra; McClintock-Trunkey Co.* v. *Commissioner, supra.* Although the tax years involved in the cases before us are 1948 and 1950, and a 1954 re-enactment of course cannot conclusively demonstrate the propriety of an administrative and judicial interpretation and application as made to transactions occurring before the re-enactment, the 1954 action of Congress is significant as indicating satisfaction with the interpretation consistently given the statute by the Regulations here at issue and in demonstrating its prior intent. Cf. *United States* v. *Stafoff,* 260 U. S. 477, 480.

Under these circumstances we think that the Regulations have acquired the force of law. This is not a case where the Government seeks to cloak an interpretative regulation with immunity from judicial examination as to conformity with the statute on which it is based simply because Congress has for some period failed affirmatively to act to change the interpretation which the regulation gives to an otherwise unambiguous statute. Cf. *Jones* v. *Liberty Glass Co.,* 332 U. S. 524. Nor is it a case where

[16] Internal Revenue Code of 1954, 26 U. S. C. (Supp. V) § 162.

no reliable inference as to Congress' intent can be drawn from re-enactment of a statute because of a conflict between administrative and judicial interpretation of the statute at the time of its re-enactment. Cf. *Commissioner v. Glenshaw Glass Co.*, 348 U. S. 426, 431. Here we have unambiguous regulatory language, adopted by the Commissioner in the early days of federal income tax legislation, in continuous existence since that time, and consistently construed and applied by the courts on many occasions to deny deduction of sums expended in efforts to persuade the electorate,[17] even when a clear business motive for the expenditure has been demonstrated.

In these circumstances we consider that what was said in *Massachusetts Mutual Life Ins. Co. v. United States,* 288 U. S. 269, 273, applies here:

> "This action [of Congress in re-enacting a statute] was taken with knowledge of the construction placed upon the section by the official charged with its administration. If the legislative body had considered the Treasury interpretation erroneous it would have amended the section. Its failure so to do requires the conclusion that the regulation was not inconsistent with the intent of the statute [citations] unless, perhaps, the language of the act is unambiguous and the regulation clearly inconsistent with it. [citation]." [18]

This Court has heretofore recognized that the "ordinary and necessary" language of the Code is hardly unambiguous, see *Textile Mills Securities Corp. v. Commissioner,*

---

[17] *Smith* v. *Commissioner, supra,* can hardly be regarded as a break in the uniform chain of decisions. See Note 10, *supra.*

[18] See also *Helvering* v. *Winmill,* 305 U. S. 79, 83: "Treasury regulations and interpretations long continued without substantial change, applying to unamended or substantially reënacted statutes, are deemed to have received congressional approval and have the effect of law."

*supra,* and we cannot say that these Regulations are clearly, or even apparently, inconsistent with it. Cf. *Trust of Bingham* v. *Commissioner,* 325 U. S. 365.

The statutory policy is further evidenced by the treatment given by Congress to the tax status of organizations, otherwise qualified for exemption as organized exclusively for "religious, charitable, scientific, literary, or educational purposes," which engage in activities designed to promote or defeat legislation. As early as 1934 Congress amended the Code expressly to provide that no tax exemption should be given to organizations, otherwise qualifying, a substantial part of the activities of which "is carrying on propaganda, or otherwise attempting, to influence legislation," and that deductibility should be denied to contributions by individuals to such organizations. Revenue Act of 1934, §§ 101 (6), 23 (o)(2), 48 Stat. 700, 690. And a year thereafter, when the Code was for the first time amended to permit corporations to deduct certain contributions not qualifying as "ordinary and necessary" business expenses, an identical limitation was imposed. Revenue Act of 1935, § 102 (c), 49 Stat. 1016. These limitations, carried over into the 1939 and 1954 Codes,[19] made explicit the conclusion derived by Judge Learned Hand in 1930 that "political agitation as such is outside the statute, however innocent the aim . . . . Controversies of that sort must be conducted without public subvention; the Treasury stands aside from them." *Slee* v. *Commissioner,* 42 F. 2d 184, 185. The Regulations here contested appear to us to be but a further expression of the same sharply defined policy.

Petitioners suggest that if the Regulations are construed to deny them deduction, a substantial constitutional issue under the First Amendment is presented.

---

[19] Internal Revenue Code of 1939, 26 U. S. C. §§ 23 (o)(2), (q) (2), 101 (6); Internal Revenue Code of 1954, 26 U. S. C. (Supp. V) §§ 170 (c)(2)(D), 501 (c)(3).

They rely upon *Speiser* v. *Randall,* 357 U. S. 513, where a California statute requiring the taking of a loyalty oath as a condition of property tax exemption was struck down on grounds of procedural due process. This contention, made by neither petitioner below, is without merit. *Speiser* has no relevance to the cases before us. Petitioners are not being denied a tax deduction because they engage in constitutionally protected activities, but are simply being required to pay for those activities entirely out of their own pockets, as everyone else engaging in similar activities is required to do under the provisions of the Internal Revenue Code. Nondiscriminatory denial of deduction from gross income to sums expended to promote or defeat legislation is plainly not " 'aimed at the suppression of dangerous ideas.' " 357 U. S., at 519. Rather, it appears to us to express a determination by Congress that since purchased publicity can influence the fate of legislation which will affect, directly or indirectly, all in the community, everyone in the community should stand on the same footing as regards its purchase so far as the Treasury of the United States is concerned.

*Affirmed.*

MR. JUSTICE DOUGLAS, concurring.

*Valentine* v. *Chrestensen,* 316 U. S. 52, 54, held that business advertisements and commercial matters* did not enjoy the protection of the First Amendment, made

---

*Two decisions prior to the *Valentine* case approved broad regulation of commercial advertising. *Fifth Avenue Coach Co.* v. *New York,* 221 U. S. 467, was decided long before *Stromberg* v. *California,* 283 U. S. 359, extended the application of the First Amendment to the States. In *Packer Corp.* v. *Utah,* 285 U. S. 105, the First Amendment problem was not raised. The extent to which such advertising could be regulated consistently with the First Amendment (cf. *Cantwell* v. *Connecticut,* 310 U. S. 296; *Martin* v. *Struthers,* 319 U. S. 141; *Breard* v. *Alexandria,* 341 U. S. 622; *Roth* v. *United States,* 354 U. S. 476) has therefore never been authoritatively determined.

applicable to the States by the Fourteenth. The ruling was casual, almost offhand. And it has not survived reflection. That "freedom of speech or of the press," directly guaranteed against encroachment by the Federal Government and safeguarded against state action by the Due Process Clause of the Fourteenth Amendment, is not in terms or by implication confined to discourse of a particular kind and nature. It has often been stressed as essential to the exposition and exchange of political ideas, to the expression of philosophical attitudes, to the flowering of the letters. Important as the First Amendment is to all those cultural ends, it has not been restricted to them. Individual or group protests against action which results in monetary injuries are certainly not beyond the reach of the First Amendment, as *Thornhill* v. *Alabama,* 310 U. S. 88, which placed picketing within the ambit of the First Amendment, teaches. And see *Newell* v. *Local Union,* 181 Kan. 898, 182 Kan. 205, 317 P. 2d 817, 319 P. 2d 171, reversed, 356 U. S. 341. A protest against government action that affects a business occupies as high a place. The profit motive should make no difference, for that is an element inherent in the very conception of a press under our system of free enterprise. Those who make their living through exercise of First Amendment rights are no less entitled to its protection than those whose advocacy or promotion is not hitched to a profit motive. We held as much in *Follett* v. *McCormick,* 321 U. S. 573. And I find it difficult to draw a line between that group and those who in other lines of endeavor advertise their wares by different means. Chief Justice Hughes speaking for the Court in *Lovell* v. *Griffin,* 303 U. S. 444, 452, defined the First Amendment right with which we now deal in the broadest terms, "The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion." And see *Jamison* v. *Texas,* 318 U. S. 413, 416; *Martin* v. *Struthers,*

319 U. S. 141, 143; *Burstyn* v. *Wilson,* 343 U. S. 495, 501–502.

In spite of the overtones of *Valentine* v. *Chrestensen, supra,* I find it impossible to say that the owners of the present business who were fighting for their lives in opposing these initiative measures were not exercising First Amendment rights. If Congress had gone so far as to deny all deductions for "ordinary and necessary business expenses" if a taxpayer spent money to promote or oppose initiative measures, then it would be placing a penalty on the exercise of First Amendment rights. That was in substance what a State did in *Speiser* v. *Randall,* 357 U. S. 513. "To deny an exemption to claimants who engage in certain forms of speech is in effect to penalize them for such speech." *Id.,* at 518. Congress, however, has taken no such action here. It has not undertaken to penalize taxpayers for certain types of advocacy; it has merely allowed some, not all, expenses as deductions. Deductions are a matter of grace, not of right. *Commissioner* v. *Sullivan,* 356 U. S. 27. To hold that this item of expense must be allowed as a deduction would be to give impetus to the view favored in some quarters that First Amendment rights must be protected by tax exemptions. But that proposition savors of the notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State. Such a notion runs counter to our decisions (*Grosjean* v. *American Press Co.,* 297 U. S. 233, 250; *Murdock* v. *Pennsylvania,* 319 U. S. 105, 112; *Follett* v. *McCormick, supra,* at 578), and may indeed conflict with the underlying premise that a complete hands-off policy on the part of government is at times the only course consistent with First Amendment rights. See *McCollum* v. *Board of Education,* 333 U. S. 203.

With this addendum, I concur in the opinion of the Court.