James C. H. SIMMONS and Vanita Simmons, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. No. C–67–259.

United States District Court, W. D. Tennessee, W. D.

July 15, 1971.

Elwood Edwards, Jack Petree, Evans, Petree, Cobb & Edwards, Memphis, Tenn., for plaintiffs.

Lynn W. Ross, Jr., Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM OPINION

WELLFORD, District Judge.

This is a tax refund suit brought by a Memphis neurosurgeon, a member of a well-known medical group which was reorganized in 1961 from a partnership into a professional association. The facts have been stipulated and, essentially, are as follows:

1. Plaintiffs are husband and wife. Mrs. Simmons is a party to this action only because joint income tax returns were filed for the year in suit. Accordingly, the term plaintiff hereinafter will refer to James C. H. Simmons (hereinafter referred to also as Simmons).

2. This is a tax refund suit brought to recover Federal income taxes in the amount of $2,377.55, plus assessed and statutory interest with respect to the calendar year 1965.

3. James C. H. Simmons is a physician duly licensed to practice his profession in the State of Tennessee and Simmons has entered into an employment agreement with Semmes-Murphey Clinic, a professional association (hereinafter referred to as the Clinic), organized under the laws of the State of Tennessee.

4. That on June 30, 1961, the Clinic sought a determination from the District Director at Nashville, Tennessee, to determine the qualification of the Clinic Employees' Pension Plan and Trust under the provisions of Sections 401 and 501 of the Internal Revenue Code of 1954.

That said District Director stated that Internal Revenue Service could not issue an opinion as to the qualifications of the said Pension Plan and Trust, as it did not recognize the Clinic as a legal entity.

That the Clinic withdrew its request for ruling with respect to its Pension Plan and Trust on September 28, 1961.

That the Clinic renewed its request for a ruling on the qualification of its Pension Plan and Trust on August 3, 1964.

5. Simmons filed a joint Federal income tax return for the calendar year 1965, and fully paid the $11,151.18 liability reported thereon, which liability as reported, included his distributive share of Clinic income as though the Clinic were a partnership.

Simmons then filed an amended return on June 24, 1966, reporting a tax liability of $8,991.05, based on his contention that the Clinic was a corporation for Federal income tax purposes, rather than a partnership, and that he should be taxed as an employee of the Clinic rather than as a partner. Concurrently with the filing of the amended return, plaintiff filed a claim for refund with the Internal Revenue Service seeking to recover $2,377.55.

6. The claim for refund was not acted upon by the Internal Revenue Service and, after the expiration of the time required by law, suit was filed by Simmons.

7. The complaint giving rise to this action was timely filed, and the Court has jurisdiction under Section 1346(a) (1) of Title 28, United States Code.

8. On March 9, 1961, Subsection (3), Sec. 61–105, Tennessee Code Annotated was enacted, specifically approving the practice of medicine by professional associations and providing that they be treated as corporations under Tennessee law.

9. The Articles of the Association of the Clinic were enacted on January 3, 1961, and filed with the Secretary of State of the State of Tennessee on May 31, 1961, and same were duly recorded in the office of the Register of Shelby County, Tennessee. Amended Articles of Association were properly filed and recorded on January 15, 1962.

10. The initial stockholders in the Clinic were the following doctors:

| | |
|---|---|
| R. Eustace Semmes | 6,585 Shares |
| Francis Murphey | 8,231 Shares |
| Elmer C. Schultz | 8,231 Shares |
| Richard L. DeSaussure | 7,281 Shares |
| James C. H. Simmons | 1,330 Shares |

11. The Clinic has operated under the provisions of Subsection (3), Sec. 61–105, T.C.A. and its Articles of Association since March 9, 1961.

12. On January 3, 1961, the Clinic adopted the Semmes-Murphey Clinic Employees' Pension Plan and Trust under which contributions were made on behalf of Simmons during the calendar year 1965.

13. The parties agree that the Clinic is a corporation for Federal income tax purposes for the year 1965, and Simmons was an employee of said corporation during said year.

14. For the year 1965, all employed physicians and certain non-professional employees qualified for maximum Social Security benefits of $127.00 per month.

15. The maximum monthly retirement benefit in 1965 for employees of the Clinic payable from the Pension Trust was $673.00 per month, based on a maximum compensation of $2,000.00 per month to be considered in computing benefits under the Pension Plan.

16. The Clinic Pension Plan and Trust is an offset type plan.

17. For the year 1965, the basic monthly salary of each physician employee, including plaintiff, was as reflected in Exhibit 6. In addition, the total compensation of all employees is reflected on said Exhibit 6.[1]

18. Exhibit 7 is a schedule furnished the plaintiff by the insurance company which provides the insurance coverage under the plaintiff's Pension Plan and Trust. The figures shown in the schedule are based on each of the employees continuing under coverage of the Plan until age 65.[2]

19. No death or retirement benefits had been paid from the Pension Plan from the commencement of the Plan through December 31, 1965.

The principal issues raised by the parties on the record are:

I. Did the Pension Plan adopted by the Clinic qualify under Sections 401 and 501 of the Internal Revenue Code of 1954, so that certain payments to the Pension Trusts could be excluded from taxpayer income for the year in question?

II. If not, should the Commissioner of Internal Revenue be estopped or barred from objecting to the qualifications of the Pension Plan by reason of his refusal to issue an advance determination letter or to state his objections to the Plan as originally filed except on the basis of refusing to recognize the professional corporate status of the Clinic)?

The Commissioner contended originally and consistently that the Clinic did not qualify as a professional corpo-

1. See Appendix.

2. See Appendix.

ration and therefore from 1961 until November 12, 1965, refused to treat the Clinic as a corporation. On that date, however, apparently by reason of the addition of paragraph (b), (Treasury Decision 6797), to Section 301.7701–2 of Internal Revenue Regulations, the Commissioner ruled that the Clinic should be treated as a corporation and its associates as employees for tax years through 1964, but he specifically refused to rule on later years.

Early in 1966, as a means of getting the matter before the courts so that a determination would be made, Simmons filed a tax return for the year 1965, and reported, as a part of his income, the contributions which the Clinic made to the Pension Plan on his behalf. Simmons then filed an amended and corrected return reporting only his current compensation from the Clinic and in conjunction, filed a claim for refund, the subject of this suit. Subsequent to the filing of the refund claim, the Internal Revenue Service audited the Clinic and its physician employees. Mr. James Farmer, in a Revenue Agent's Report, dated June 5, 1967, assessed tax against the Clinic for the years, 1963 and 1964, on the basis that the entire contribution made by the Clinic to its Pension Plan was not deductible by the Clinic because the Plan was not qualified. Mr. Farmer also assessed tax against the shareholder employees for the year 1965, on the basis that the Clinic did not comply with U. S. Treasury Regulation Section 301.7701–2 (h) promulgated February 2, 1965, stating in his report to Simmons "the principal change in tax liability was a result of a determination that the Clinic does not qualify to be taxed as a corporation in 1965. The contribution to the Employees' Pension Trust was also disallowed as a deduction."

Treasury Information Release 1019, August 8, 1969, announced that the Internal Revenue Service would, reversing its previous position, generally treat a medical professional asociation properly organized and qualifying under state law (as was the Clinic in this instance) as a corporation. See O'Neill v. United States, 410 F.2d 888 (C.A. 6, 1969); Kurzner v. United States, 413 F.2d 97 (C.A. 5, 1969).

I

The Commissioner takes the position that the Pension Trust did not qualify in 1965 for each of three separate reasons; therefore, the nonforfeitable contributions made to the Trust on taxpayer Simmons' behalf in that year must be included in his income. The asserted reasons for nonqualification are:

(1) Because death benefits provided by the plan through life insurance are not "incidental".

(2) Because it discriminates in failing to satisfy requirements of integration with social security benefits.

(3) Because the plan does not define compensation on which benefits will be based as the average of the annual compensation paid over a period of five consecutive years.

A pension plan qualifying under Section 401(a) of the Code is a plan designed primarily to provide employee benefits at retirement. However, it is also permissible for a plan to provide current life insurance protection, and still remain qualified under Section 401 (a) if such insurance protection is merely incidental to the main purpose of the plan.

See Sec. 1.401–1(b) (1) (i) Internal Revenue Service Regulations; Rev.Rul. 60–83, 1960–1 Cum.Bull. 157, 158.

Part 2(n) (1) of Rev.Rul. 65–178, 1965–2 Cum.Bull. 94, 106, citing Rev.Rul. 60–83, *supra*, provides that where a pension plan is funded with insurance contracts, "the life insurance benefit is deemed to be incidental where the insurance benefit is no greater than 100 times the monthly annuity, e. g., $1,000.00 of life insurance for each $10.00 of a monthly annuity."

The Clinic plan "contemplates the purchase (and carried out this intent) of insurance contracts providing $1,000.00 of insurance protection for each $10.00 of monthly retirement benefit based on 65% of basic monthly salary less estimated Social Security benefits * * *"

Since the basic monthly salary of each shareholder-doctor was $2,000.00, and the estimated social security benefits for each would be $127.00, the amount of current life insurance to be purchased for each under the plan may be computed as follows: 65 percent of $2,000.00 equals $1,300.00. This figure of $1,300.00 less $127.00 estimated social security benefits, leaves $1,173.00 which, applied to the ratio as provided in the plan (1,000 to 10), results in $117,300.00 of current life insurance protection provided for each of the shareholder-doctors under the plan.[3]

It is the further contention of the Commissioner that since the monthly annuity provided for Simmons and the other doctor-shareholders in the Clinic was $673.00, that the maximum amount of life insurance that could properly have been provided for each would be $67,300.00 instead of the $117,300.00 amount (or higher amount if the taxpayer figures are used.) Citing for this contention, Raymond J. Moore, et al. v. C. I. R., 45 BTA 1073, acq., CB 1944, 20; see Rev. Rul. 60–83, 1960–1 Cum.Bull. 157, and also Rev.Rul. 65–178, 1965–2 Cum.Bull. 94, 106.

■ It is difficult to see how insurance benefits approximately 50% or more than the formula approved in the Revenue Rulings would be merely "incidental" to pension benefits. "Incidental" is defined in Webster's Third International Dictionary as "subordinate, nonessential, * * * occurring merely by chance * * * as a minor concomitant (allowing a few dollars extra for expenses); not receiving much consideration or calclulation * * * " The value of life insurance under the Plan in event of death prior to retirement age 65 also is hardly a matter "not receiving much consideration" under all the circumstances, particularly where at the time the Plan was adopted the average age of the

doctors was almost six (6) years older than that of other eligible employees and the cost of the pure life insurance element for the doctors would necessarily have had to be higher than the overall Plan average of life insurance cost per participant. Nevertheless, the net cost by reason of building substantial cash value of life insurance as to all participants would be in the Clinic plan, according to taxpayer, less than 10% of the total contribution.

The Internal Revenue Service also contends that the pension plan in question fails because the formula presented in Rev.Rul. 61–75 limits the offset to a maximum 93.6% of Social Security benefits.

The plan in question provides for reduction in benefits by 100% of the benefits to be received under the Social Security Act. To determine whether proper integration with Social Security has been achieved, it is necessary to refer to Mim. 6641, 1951–1 Cum.Bull. 41; Rev. Rul. 13, 1952–1 Cum.Bull. 294; Rev.Rul. 56–692, 1956–2 Cum.Bull. 287; and Rev. Rul. 61–75, 1961–1 Cum.Bull. 140. This determination, therefore, is derived from the formula as set out in Mim. 6641, supra ¶¶ 6, 7 and 15 at pp. 45–46 and 51) as modified by Rev.Rul. 61–75, supra (¶¶ 6 and 8 at pp. 141 and 142).

The Clinic plan provides for a 100% offset of social security benefits, and would therefore on its face not satisfy the integration of social security requirements within the meaning of I.R.C. 401(a).

It is not necessary to consider in detail the third objection to this plan posed by the government in view of the finding that the plan technically fails to comply by reason of more than "incidental" insurance benefits, and because of its failure to meet social security integration standards. It should be pointed out, however, that the Clinic, in voluntarily limiting salary participation of the par-

---

3. The taxpayer concedes in his brief that the amount of insurance coverage provided for in the Clinic plan is $1740.00 for every anticipated $10.00 monthly in- come, a higher figure than the calculation made by the Commissioner. (See additional points and authorities, page 858).

ticipating doctors, including taxpayer Simmons, has as a practical matter mitigated the supposed "discriminatory" aspects of the failure to comply with the maximum 93.6% maximum allowable offset for social security benefits.

The taxpayers assert, furthermore, that they could have adopted a plan meeting the objections here posed by the Commissioner with all compensation covered so that doctor employees would have a much larger pension benefit and insurance coverage without increasing commensurately other employee benefits under an approved plan. This may be true had the clinic or its representatives had the opportunity of discussion with the Internal Revenue Service as to the technical merits or deficiencies of the plan prior to 1965. It should be pointed out, however, that Revenue Ruling 65–178 dealing with the Service's concept of "incidental insurance benefit" was published in mid-1965 in sufficient time for taxpayer to be adequately apprised of the Commissioner's position in this respect. Also, the rulings applicable 61–75 and mimeograph 6641 dealing with appropriate integration of social security benefits in an approved plan were set out in 1961 when this plan was adopted.

## II

■ Should the government, under the circumstances here, be barred from raising the technical objections to the merits and qualifications of the Clinic Plan? No doubt, had the government prior to or during 1965, indicated to the taxpayer or the Clinic its basis for objection, the plan might have been amended to conform to Internal Revenue Service requirements. The voluntary limitation of doctor salaries was an indication of an effort to avoid discrimination in favor of highly compensated employees. There is an equitable appeal to the Court to take into account a "duty" on the part of defendant of responding to its request or application for approval of the plan made in January of 1961, and again made in October of that year when a ruling was requested. The regulations pursuant to I.R.S. Sec. 401 prescribe that the plan must be one "found by the Commissioner not to be discriminatory in favor of certain specified classes of employees." (Sec. 1.401–1(a) (3) (v)). The Code itself requires that "contributions or benefits provided under the plan (intended to qualify) * * * not discriminate in favor of employees who are officers, shareholders * * * or highly compensated employees." I.R.C. 401 (a) (4) (The words, "intended to qualify," used in subsection (3)). Rules and regulations have been established for many years and noted in tax services and articles specifying standards adopted by the Commissioner to prevent such discrimination. Courts are inclined to respect such long standing administrative interpretations unless clearly erroneous. See Commissioner of Internal Revenue v. Pepsi-Cola Niagara Bottling Corp., 399 F.2d 390 (C.A. 2, 1968) and Cammarano v. United States, 358 U.S. 498, 79 S.Ct. 524, 3 L.Ed.2d 462 (1959).

■■ In view of the Commissioner's power to find or determine whether or not a proposed pension plan conforms to the law, is he *obliged* to rule upon the technical details of taxpayer's plan when it is presented to him or within a reasonable period thereafter? In this case, the Commissioner's representative declined to pass upon or to approve its legality on what turned out to be an incorrect basis, asserting that the Clinic's corporate status was deficient. He later acquiesced, after unfavorable Court decisions, in the professional corporate status, but is he precluded from making objections by reason of asserted violations of rules or standards pertaining to prohibited discriminatory favoritism to highly paid and controlling persons such as Simmons? It is generally held that the United States of America is not estopped except by authority of statute. At best, it may be said for plaintiff that equitable estoppel against the sovereign will be invoked only under very exceptional circumstances. 31 C.J.S. Estoppel § 140. In re Krieger Steel Sections, 103 F.Supp. 351, 353 (D.C.N.Y.1951); First National Bank of Montgomery v. United States, D.C., 176 F.Supp. 768, aff'd 285 F.2d

123 (C.A. 5, 1961); Burnet v. Porter, 283 U.S. 230, 51 S.Ct. 416, 75 L.Ed. 996 (1931).

■■ The benefits of special deductions under the tax laws, where limited by express terms, are not to be expanded by Court interpretation. Miss. River Fuel Corp. v. Koehler, 266 F.2d 190 (C.A. 8, 1959).[4] The burden of proof is upon the taxpayer who claims the deduction in this type of situation. United States v. Hall, 398 F.2d 383, 390 (C.A. 8, 1968); Duguid & Sons, Inc. v. United States, 278 F.Supp. 101 (D.C.N.Y.1967). For the plaintiff taxpayer to carry that burden, the Court must declare in effect that he was entitled as a matter of law to a determination letter as to the validity of a pension plan, else the Commissioner may not be later heard to challenge it, (albeit on what appear to be technical grounds.) While sympathetic to taxpayer's plight and frustration in his effort to establish the legal status of his professional corporation prior to 1969, he proceeded, we believe, at his peril in claiming a deduction on a contribution to a pension plan which had not received prior approval from proper authority. As heretofore stated, we cannot find that the Clinic plan was in accordance with the Commissioner's rules and regulations setting up certain insurance and social security requirements pertaining to what he deems to be discriminatory provisions. Technically, the plan fails for the reasons stated, and so must the taxpayer fail in his claim for a refund based upon the legality and validity of that plan in 1965. Taxpayer's able counsel have succeeded in presenting a case where equity might otherwise compel favorable consideration but for the fact that it is the government who is defending, where its agents never have admitted the validity of the Plan from 1961 to this time.

The Commissioner has been upheld in tax cases where he has changed his position by reason of mistake or error with regard to the taxpayer, even in situations where the taxpayer relied upon a purported informal agreement or the Commissioner's position to his detriment. Automobile Club of Michigan v. Comm. of Internal Revenue, 353 U.S. 180, 77 S.Ct. 707, 1 L.Ed.2d 746 (1957); Tollefsen v. Comm. of Internal Revenue, 431 F.2d 511 (C.A. 2, 1970); Cleveland Trust Co. v. United States, 421 F.2d 475 (C.A. 6, 1970); Sampson v. Comm. of Internal Revenue, 444 F.2d 530 (C.A. 6, 6–30–71). See Botany Worsted Mills v. United States, 278 U.S. 282, 289, 49 S.Ct. 129, 73 L.Ed. 379 (1929). The taxpayer argues that he has a "right" to an advance ruling on the merits of his pension plan which implants a corresponding "duty" on the Commissioner or his representative to indicate his objections to such plan under Rev.Procedure 56–12 (in effect when the plan was originally submitted). That the Commissioner indicated an objection on one basis no longer sustainable does not, in our view, prohibit his objection on other bases under the law or lawful regulations where the taxpayer, as here, has the burden of establishing the claimed deduction. We have found that the plan in question does not technically conform to the requirements of law and the rulings pertinent to I.R.C. Sections 401 and 501. The claimed contribution to the pension trust exceeded the allowable bounds of the revenue rulings specified as to (1) death benefits provided by life insurance (beyond "incidental" limits) and as to (2) integration with social security benefits. Therefore, taxpayer is denied the refund sued for. Due to the peculiar circumstances of this case, however, and because there appears to have been no effort on the part of the Clinic to discriminate in favor of highly paid personnel, if there were a feasible way of disallowing only that portion of the deduction claimed which is excessive under the

---

4. "Allowance of deductions * * * does not turn on general equitable considerations." Deputy v. Du Pont, 308 U.S. 488, 493, 60 S.Ct. 363, 366, 84 L.Ed. 416 (1940).

applicable regulations specified, this Court would be inclined to follow such a procedure. No figures, computations, or calculations to this effect having been submitted, the Court will reluctantly hold for the defendant.

## APPENDIX

### EXHIBIT 6

Semmes-Murphey Clinic—Compensation for year 1965 for physicians:

| Name | Monthly Salary | | Annual Salary | Annual Bonus | Total for Year 1965 |
|------|------|------|------|------|------|
| Dr. Semmes (s/h) | 2,000.00 | | 24,000.00 | —0— | 24,000.00 |
| Dr. Murphey (s/h) | 2,000.00 | | 24,000.00 | 39,658.00 | 63,658.00 |
| Dr. Schultz (s/h) | 2,000.00 | | 24,000.00 | 39,658.00 | 63,658.00 |
| Dr. DeSaussure (s/h) | 2,000.00 | | 24,000.00 | 38,552.00 | 62,552.00 |
| Dr. Simmons (s/h) | 2,000.00 | | 24,000.00 | 17,854.00 | 41,854.00 |
| Dr. Wood | 2,000.00 | | 24,000.00 | 15,168.00 | 39,168.00 |
| Dr. Robertson | (Jan.–May | 1,500.00) | 21,500.00 | —0— | 21,500.00 |
| | (June–Dec. | 2,000.00) | | | |
| Dr. Nofzinger * | (Jan.–June | 500.00) | 8,750.04 | —0— | 8,750.04 |
| | (July–Dec. | 958.34) | | | |

* During this year Dr. Nofzinger was keeping the salary which he received from U. T. and the Clinic was supplementing this. At some later period he turned this U. T. salary over to the Clinic and then began receiving his full salary.

### EXHIBIT 7

### SEMMES–MURPHEY CLINIC EMPLOYEES' PENSION PLAN AND TRUST

### EMPLOYEES COVERED UNDER THE PLAN FOR YEAR, 1965

| | | | | Analysis of the Cost of Insurance | |
|------|------|------|------|------|------|
| Name of Employee | Insurance Age at date of entry into Plan | Number of years under Plan from entry into Plan until age 65 | Aggregate insurance premiums to be paid from entry into Plan until age 65 | Aggregate contribution to Pension Trust for both insurance premiums and auxiliary fund from date of entry into Pension Plan to age 65 | Cash value of insurance at age 65 |
| Dr. Murphey | 54 | 11 | $ 52,296 | $ 97,482 | $ 34,382 |
| Dr. Schultz | 48 | 17 | 62,236 | 92,553 | 47,803 |
| Dr. DeSaussure | 43 | 22 | 65,625 | 87,544 | 56,665 |
| Dr. Simmons | 34 | 31 | 66,108 | 79,328 | 66,711 |
| Miss Palmer | 58 | 7 | 6,245 | 6,245 | 9,597 |
| Miss Hill | 55 | 10 | 6,208 | 7,537 | 3,784 |
| Miss Frank | 35 | 30 | 9,170 | 9,183 | 8,159 |
| Miss Jackson | 45 | 20 | 7,304 | 7,304 | 5,446 |
| Miss Barnes | 25 | 40 | 4,358 | 4,358 | 3,988 |
| Miss Thomas | 33 | 32 | 9,697 | 9,697 | 8,354 |
| M. A. Jappe | 56 | 9 | 461 | 461 | 268 |
| Jessie Davis | 38 | 27 | 672 | 672 | 516 |
| Lois Currier | 28 | 37 | 4,440 | 4,440 | 5,292 |
| Norma Finney | 26 | 39 | 4,087 | 4,087 | 4,460 |
| David Hamilton | 39 | 26 | 23,504 | 28,025 | 20,899 |
| Mildred Worley | 47 | 18 | 4,142 | 4,142 | 3,268 |
| Dr. Wood | 39 | 26 | 66,132 | 84,561 | 59,119 |
| June Djoy | 27 | 38 | 6,916 | 6,916 | 7,701 |
| Pauline Ginnoven | 51 | 14 | 3,667 | 3,667 | 2,767 |
| Glenn Wilson | 25 | 40 | 6,413 | 6,413 | 7,277 |
| Total | | | $409,681 | $544,615 | $356,456 |