**Anthony HASWELL**

v.

**The UNITED STATES.**
No. 818–71.

United States Court of Claims.
July 19, 1974.

Charles W. Schoeneman, Washington, D. C., attorney of record, for plaintiff.

Allan C. Lewis, Washington, D. C., with whom was Asst. Atty. Gen. Scott P. Crampton, for defendant. Gilbert E. Andrews, Jr. and Joseph Kovner, Washington, D. C., of counsel.

Before NICHOLS, KASHIWA and BENNETT, Judges.

## OPINION

PER CURIAM:

This case comes before the court on plaintiff's exceptions to the recommended decision filed on October 10, 1973, by Trial Judge Kenneth R. Harkins pursuant to Rule 134(h), having been submitted on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the decision, as hereinafter set forth,* it hereby adopts the same as the basis for its judgment in this case.** Therefore, plaintiff is not entitled to recover and the petition is dismissed.

## OPINION OF TRIAL JUDGE

HARKINS, Trial Judge:

Plaintiff seeks a refund of income taxes paid in 1967 and 1968 on the theory that his payments to the National Association of Railroad Passengers (NARP) were charitable contributions as then defined in Section 170(c) (2) of the Internal Revenue Code of 1954.[1] In 1967 and 1968, plaintiff timely paid income taxes of $7,783.67 and $23,059.96, respectively,

---

* Whereas the court adopts the trial judge's separate findings of fact, which are set forth in his report filed October 10, 1973, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

** The concurring opinion of Nichols, *Judge*, follows the opinion of the trial judge which has been adopted by the court.

1. 26 U.S.C. § 170(c)(2) (1970).

but did not claim a deduction for payments to NARP, which had totaled $41,864.23 in 1967 and $90,000 in 1968. On April 13, 1971, a refund of $2,765.95 was claimed for 1967 and $9,840.06 for 1968. These refund claims were disallowed on December 17, 1971.

To be deductible, a charitable contribution must satisfy section 170(c)(2), which, among other requirements, specifies that the payment be made to an organization "organized and operated exclusively" for certain purposes, and "no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation."[2] Plaintiff contends that no substantial part of NARP's activities during 1967 and 1968 was the proscribed carrying on of propaganda or otherwise attempting to influence legislation and that NARP's legislative program is properly characterized as the making available of the results of nonpartisan analysis, study, or research which section 170(c)(2) does not proscribe.

In the event section 170(c)(2) is construed, or its application is interpreted, to prevent a deduction because of NARP's legislative efforts, plaintiff contends such application would violate plaintiff's first amendment rights to freedom of speech and peaceably to petition the legislature for redress of grievances. Further, such application of section 170(c)(2) would infringe plaintiff's rights to equal protection under the due process clause of the fifth amendment.

As will be shown, in 1967 and 1968, NARP was not operated exclusively for the purposes required by section 170(c)(2)(B) and a substantial part of its activities involved attempts to influence legislation within the limitation of section 170(c)(2)(D). Disallowance of plaintiff's payments to NARP in 1967 and 1968 as charitable contributions under Section 170 of the Internal Revenue Code of 1954 does not violate plaintiff's rights under the first or fifth amendment to the Constitution.

## I

### Summary of Facts

In 1967, plaintiff's concern over discontinuances of passenger trains in the United States caused him to undertake a program to preserve, improve, and expand railroad passenger service. As part of this program, plaintiff caused NARP to be incorporated on May 18, 1967, under the "General Not For Profit Corporation Act" of Illinois. The purposes for which NARP was organized were to act as a focal point for, and to undertake, programs designed to encourage and promote maintenance and improvement of passenger services, operations, and facilities of American railroads.[3]

2. Section 170(c)(2) provides:
"(c) Charitable contribution defined.—For purposes of this section, the term 'charitable contribution' means a contribution or gift to or for the use of—
\* \* \* \* \*
"(2) A corporation, trust, or community chest, fund, or foundation—
"(A) created or organized in the United States or in any possession thereof, or under the law of the United States, any State or Territory, the District of Columbia, or any possession of the United States;
"(B) organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes or for the prevention of cruelty to children or animals;
"(C) no part of the net earnings of which inures to the benefit of any private shareholder or individual; and

"(D) no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation. "A contribution or gift by a corporation to a trust, chest, fund, or foundation shall be deductible by reason of this paragraph only if it is to be used within the United States or any of its possessions exclusively for purposes specified in subparagraph (B)."

3. NARP's Articles of Incorporation and its By-Laws stated the purposes:
"All for the promotion of the common good and general social welfare and the bringing about of civic betterments and social improvements, to act as a focal point for, and either by itself or in conjunction with other associations, groups or individuals to undertake, programs and actions designed to encourage and promote the maintenance and

Although it was incorporated as a membership corporation and, by December 31, 1968, NARP had approximately 3,000 members, the major source of its income was plaintiff's personal funds. In 1967, plaintiff's payments to NARP were equal to 83.2 percent of its total expenditures, and in 1968 were equal to 86.7 percent. After NARP was formed, plaintiff devoted full time to its affairs. Plaintiff has been NARP's only chairman and, in 1967 and 1968, was its executive director. Plaintiff received no salary and was reimbursed for NARP's entertainment and travel expenses only. NARP's staff during 1967 and 1968, in addition to plaintiff, was a full-time secretary and a clerical helper.[4]

Plaintiff's ideas as to the best way to assert the interests of the users and consumers of rail passenger transportation were implemented through NARP. The conditions sought to be achieved through NARP were (1) adequate legal controls over train discontinuances; (2) fair and equal governmental treatment of the rail passenger; and (3) a national transportation policy in which rail passenger service was an essential element. In 1967 and 1968, NARP's program involved educational activities, litigation before the Interstate Commerce Commission or other regulatory agencies to oppose specific proposals for discontinuances of passenger train service, and attempts to influence legislation.

NARP's educational and informational activities to inform the public on problems that affected rail passenger consumers, in 1967 and 1968, included publication of a report, a brochure, a survey of passenger train operations, information made available in NARP's press releases, and speeches made by plaintiff to such organizations as the Passenger Club of Chicago and the Washington Chapter of the Transportation Research Forum.

NARP's litigation activities were limited in 1967, but were expanded substantially in 1968. In 1967, NARP sent two or three letters to the Interstate Commerce Commission to protest discontinuances of passenger trains. In 1968, NARP retained counsel for representation in seven discontinuance proceedings at the ICC, as well as in the ICC "adequacies" case, an investigation to determine whether the ICC had jurisdiction to regulate the adequacy of passenger train service. In addition, in 1968, NARP retained counsel for a case before the Ohio Public Utilities Commission relative to the Penn Central's curtailment of passenger service in Ohio. As part of its litigation effort, NARP also secured, as needed, services of a cost expert and a marketing consultant.

From the start of his program, plaintiff recognized that attainment of the goal to preserve, improve, and expand railroad passenger service would require political action at the national level. On May 9, 1967, prior to the incorporation of NARP, plaintiff explored his proposed program with a senior partner of National Counsel Associates (NCA), a Washington consulting firm that specialized in lobbying. In his correspondence with NCA, plaintiff indicated that he expected NCA to represent NARP in legislative matters before Congress and to promote its interests within the executive departments. Plaintiff emphasized that NARP's objectives "will require substantial legislative action by the Congress." NARP's contract with NCA was signed

---

improvement of passenger services, operations and facilities of American railroads, including, without limitation, the promotion of federal and state assistance to railroads for passenger service operations and the encouragement of American railroads to maintain and enhance present passenger services, operations and facilities."

4. NARP has a letter from the Internal Revenue Service holding it to be an exempt organization under Section 501(c)(4) of the Internal Revenue Code of 1954. NARP did not apply to the Internal Revenue Service for classification, in 1967 and 1968, as a section 501(c)(3) organization on advice of counsel at that time because NARP planned to get involved to some extent in legislation and in litigation.

on June 5, 1967, 18 days after NARP was incorporated.

In 1967 and 1968, NARP's legislative activities involved participation in proceedings in both Houses of the United States Congress in connection with legislation proposed by the Interstate Commerce Commission to amend Section 13a of the Interstate Commerce Act. As executive director of NARP, plaintiff testified four times before subcommittees of the Senate Committee on Commerce or of the Senate Committee on Banking and Currency. In addition to these appearances as executive director of NARP, plaintiff submitted four written statements or letters to the House of Representatives' Interstate and Foreign Commerce Committee or its subcommittees.

Each appearance as a witness or written submission by plaintiff on behalf of NARP was an activity that involved an attempt to influence pending legislation or to secure legislation sought by NARP. Each appearance as a witness or submission of written materials by plaintiff on behalf of NARP was in response to an invitation from the committee that had been arranged by NCA, NARP's Washington representative. In each instance that plaintiff testified, or submitted written materials, the testimony or materials stated NARP's position on behalf of the consumer rail passenger. No part of plaintiff's testimony before, or submissions to, legislative committees in 1967 and 1968 was partisan from the standpoint of identification with any particular political party. NARP has never participated in, or contributed to, a political campaign, and materials produced by NARP were not partisan from the standpoint of identification with any particular political party.

In its attempts to influence legislation, NARP advocated the interest of the consumer railroad passengers of the United States. Testimony by plaintiff and the written materials submitted did not represent nonpartisan analysis, study, or research in that the testimony or the materials were not the type of full and fair objective expositions that would enable the public to reach an independent conclusion on the subject. Plaintiff's testimony on behalf of NARP and the written materials submitted advocated a particular position and were partisan on the issue of the necessity to continue rail passenger service. In view of the complexities of rail industry operations and of its regulation, much of NARP's testimony and written materials necessarily included technical advice and assistance.[5]

---

5. Regulations promulgated under Sections 4945(d) and (e) of the Tax Reform Act of 1969 applicable to excise taxes and taxable expenditures of private foundations define "nonpartisan analysis, study or research" and "technical advice or assistance."

Treas.Reg. § 53.4945–2(d)(1)(ii) provides:

"(ii) *Nonpartisan analysis, study or research.* For purposes of section 4945(e), 'nonpartisan analysis, study, or research' means an independent and objective exposition of a particular subject matter, including any activity which is 'educational' within the meaning of § 1.501(c)(3)–1(d)(3) of this chapter. Thus, 'nonpartisan analysis, study, or research' may advocate a particular position or viewpoint so long as there is a sufficiently full and fair exposition of the pertinent facts to enable the public or an individual to form an independent opinion or conclusion. On the other hand, the mere presentation of unsupported opinion does not qualify as 'nonpartisan analysis, study, or research.' Activities of a noncommercial educational broadcasting station or network (television or radio) constitute 'nonpartisan analysis, study, or research' if the station or network adheres to the Federal Communications Commission regulations and its 'fairness doctrine' (requiring balanced, fair, and objective presentation of issues). Ordinarily, if no determination has been made by the Federal Communications Commission that the 'fairness doctrine' (as stated above) has been violated, the activities of the station or network will be treated as 'nonpartisan analysis, study, or research.' "

Technical advice or assistance results from knowledge or skill in a given area. Treas. Reg. § 53.4945–2(d)(2)(ii) provides:

"(ii) *Nature of technical advice or assistance.* 'Technical advice or assistance' may be given as a result of knowledge or skill in a given area. Because such assistance or advice may be given only at the express request of a governmental body, committee or

NARP's legislative activities were not limited to direct testimony or written submissions to congressional committees. Through NCA or through plaintiff as executive director, NARP made presentations of its views on pending legislation by personal contacts with Members of Congress, their legislative or administrative assistants, or with staff members of congressional committees. These personal presentations were made in informal meetings in legislative offices, at lunch, or over cocktails.

During 1967 and 1968, NCA was host for NARP at two or three cocktail parties to give plaintiff an opportunity to meet with Members of Congress and selected members of the staffs of Members of Congress or of congressional committees. At these cocktail parties, plaintiff and NCA talked about rail passenger problems and NARP's legislative goals for adequate passenger train service. In addition, in 1967 and 1968, NCA entertained at cocktails or lunch, for the purpose of presenting NARP's views on pending legislation, five Members of Congress, 16 legislative or administrative assistants to Members of Congress, and six professional or technical staff members of congressional committees. Plaintiff had personal interviews with approximately five to 10 Members of Congress, most of whom were members of committees or subcommittees which had legislation pending that could affect the rail passenger. In 1967, plaintiff conferred with approximately 12 to 15 congressional staff personnel on pending legislation that could affect the rail passenger and, in 1968, with approximately 30 such staff personnel.

In addition to direct attempts to influence legislation by presentations to congressional committees, Members of Congress or congressional staff personnel, NCA undertook indirect legislative activities on behalf of NARP that included meetings with personnel of the Department of Transportation and the Interstate Commerce Commission who were concerned with railroad legislation. In these meetings, NCA sought to establish NARP as a legitimate spokesman for railroad passengers.

*Background Analysis*

Federal revenue laws historically have exempted from taxation organizations created and operated exclusively for religious, charitable, scientific, literary, or educational purposes. In the Internal Revenue Code of 1954, such organizations are included in section 501(c)(3) in the enumeration of entities exempted from federal income taxation.[6] If an organization can qualify for exemption under section 501(c)(3), it acquires not only a tax exempt status, but also the status of an organization to which deductible contributions can be made.[7]

The exemption is given to section 501(c)(3) organizations because of the benefit the public is assumed to derive from their charitable, religious, educational, or similar operations. The ex-

---

subdivision, the oral or written presentation of such assistance or advice need not qualify as nonpartisan analysis, study or research. The offering of opinions or recommendations will ordinarily qualify under this exception only if such opinions or recommendations are specifically requested by the governmental body, committee or subdivision or are directly related to the materials so requested."

6. Section 501(c)(3) reads:
 "(c) List of exempt organizations.—* * *
 * * * * *
 "(3) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office."

7. Int.Rev.Code of 1954, § 170(c)(2) (income tax); § 2055(a)(2) (estate tax); and § 2522(a)(2) (gift tax).

emption, and the corresponding deduction, recognize the benefits resulting from promotion of the general welfare and are based on the theory that the Government is compensated for the loss of revenue by its relief from financial burden which would otherwise have to be met by appropriations from public funds.[8]

Prior to the Revenue Act of 1934, the revenue laws did not impose specific limitations on the political activities of tax exempt organizations. Treasury Department regulations, however, since 1919 had denied an exemption to organizations that disseminated controversial or partisan propaganda on the ground that such action was not within the exempt purposes. The Revenue Act of 1934, in sections 101(6) (exempt organizations) and 23(o)(2) (charitable deductions), added a substantiality test to the exemption for organizations "organized and operated exclusively for religious, charitable, scientific, . . . literary, or educational purposes." These sections granted the exemption or permitted the deduction of contributions to qualified organizations provided that "no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation."

The case which led to the 1934 legislation was Slee v. Commissioner of Internal Revenue.[9] In that case, the court held that the American Birth Control League was not entitled to a charitable exemption because it disseminated propaganda to legislators and to the public aimed at the repeal of laws preventing birth control. A tax exempt status was denied because the League's purpose was not exclusively charitable, educational, or scientific. In 1954, exempt status was further limited in section 501(c)(3) by a condition against participation or intervention in political campaigns on behalf of candidates for public office.

 Tax exemptions are matters of legislative grace and taxpayers have the burden of establishing their entitlement to exemptions. The limitations in sections 501(c)(3) and 170(c)(2) of the 1954 Code stem from the policy that the United States Treasury should be neutral in political affairs and that substantial activities directed to attempts to influence legislation should not be subsidized.[10] The Supreme Court in 1958 traced the development of the congressional policy against an exemption for organizations that attempt to promote or defeat legislation and stated:[11]

> * * * These limitations, carried over into the 1939 and 1954 Codes [footnote omitted], made explicit the conclusion derived by Judge Learned Hand in 1930 that "political agitation as such is outside the statute, however innocent the aim * * *. Controversies of that sort must be conducted, without public subvention; the Treasury stands aside from them."
> * * *

Until 1962, the revenue laws basically accorded the same treatment to business interests and nonbusiness interests with respect to political activities. Treasury regulations applicable to trade or business expenses consistently had not allowed a deduction for expenses incurred in lobbying, and these regulations were interpreted by the Supreme Court to preclude deductions for expenditures made in connection with efforts to promote

---

8. H.R. Rep.No. 1860, 75th Cong., 3d Sess. 19 (1939); *see generally* Geske, Direct Lobbying Activities of Public Charities, 26 Tax Lawyer 305 (1973); Walker & Rothermel, Political Activity and Tax Exempt Organizations Before and After the Tax Reform Act of 1969, 38 Geo.Wash.L.Rev. 1114 (1969–70); Christian Echoes Nat'l Ministry, Inc. v. United States, 470 F.2d 849, 853–854 (10th Cir. 1972), cert. denied, 414 U.S. 864, 94 S. Ct. 41, 38 L.Ed.2d 84 (1973).

9. 42 F.2d 184 (2d Cir. 1930).

10. Christian Echoes Nat'l Ministry, Inc. v. United States, *supra* note 8, 470 F.2d at 854.

11. Cammarano v. United States, 358 U.S. 498, 512, 79 S.Ct. 524, 533, 3 L.Ed.2d 462 (1959).

or defeat legislation by persuasion of the general public as well as efforts to influence legislative bodies through lobbying.[12]

In 1962, the provisions applicable to deductions for trade or business expenses were amended by adding a new subsection (e) to section 162 of the 1954 Code. The new subsection altered the neutrality between business and nonbusiness interests in that it allowed deductions for amounts paid "in direct connection with appearances before, submission of statements to, or sending communications to, the committees, or individual members, of Congress * * * with respect to legislation or proposed legislation of direct interest to the taxpayer."[13] The new subsection (e) also allowed deductions for amounts paid in direct connection with communication of information to a trade association or other organization with respect to legislation of mutually direct interest. Deductions were barred for any amount paid in connection with political campaigns on behalf of any candidate for public office or in connection with any attempt to influence the general public with respect to legislative matters.

Justification for the disparity in treatment for business interests by the 1962 amendment was found in the relationship to profit-motivated activities: (1) Since expenses for direct lobbying related to income-producing activities, an accurate measure of net income required that they be deductible; (2) expenses incurred in appearing before executive or administrative officials with respect to administrative matters, and before the courts with respect to judicial matters, were allowable and the expenses of appearing before legislative bodies were similar from a business standpoint; and (3) as a matter of governmental policy, it was desirable for legislative bodies to have readily available information on the impact of proposed legislation on the trade or business of affected taxpayers.

Since the 1962 amendment, similar considerations have been advanced to justify legislative efforts by charities on matters that concern their program or status. To this end, amendments have been offered to modify the restrictions of section 501 (c)(3) on direct lobbying by charities. Thus far, such efforts have been unsuccessful. Congress, in enacting the Tax Reform Act of 1969, in the only provision concerning political activities of charities, added further restrictions on such activities by private foundations. The new section 4945, added to the 1954 Code by section 101(b) of the Tax Reform Act of 1969, imposes excise taxes on amounts paid by private foundations for direct and grassroot lobbying activities even where such activities are insubstantial. The new section 4945, however, and the regulations promulgated thereunder, provide additional and more precise definition of activities that are included within the limitation "to carry on propaganda, or otherwise to attempt, to influence legislation."[14]

---

12. *Id.* at 504–505, 79 S.Ct. 524.

13. 26 U.S.C. § 162(e) (1970).

14. 26 U.S.C. § 4945(d) and (e) (1970) provide in part:

"(d) Taxable expenditure.

"For purposes of this section, the term 'taxable expenditure' means any amount paid or incurred by a private foundation—

"(1) to carry on propaganda, or otherwise to attempt, to influence legislation, within the meaning of subsection (e),

 * * * * *

"(e) Activities within subsection (d)(1).

"For purposes of section (d)(1), the term 'taxable expenditure' means any amount paid or incurred by a private foundation for—

"(1) any attempt to influence any legislation through an attempt to affect the opinion of the general public or any segment thereof, and

"(2) any attempt to influence legislation through communication with any member or employee of a legislative body, or with any other government official or employee who may participate in the formulation of the legislation (except technical advice or assistance provided to a governmental body or to a committee or other subdivision thereof in response to a written request by such body or subdivision, as the case may be),

"other than through making available the results of nonpartisan analysis, study, or research. Paragraph (2) of this subsection

Neither the legislative histories of sections 170(c)(2) and 501(c)(3), nor the cases that have arisen thereunder, provide specific guidance as to the content of the phrases "organized and operated exclusively," "no substantial part," and "to influence legislation," as used in those sections.

Treasury regulations under section 170 (c)(2) follow the statutory language and provide that, for purposes of determining whether an organization is attempting to influence legislation or is engaging in political activities, reference should be made to the regulations promulgated under section 501(c)(3).[15] The cases provide guidelines as to the extent and types of activities that disqualify the exemption and the deduction.

An organization that engages in substantial activity aimed at influencing legislation is disqualified from a tax exemption, whatever the motivation.[16] The applicability of the influencing legislation clause is not affected by the selfish and unselfish motives and interests of the organization, and it applies to all organizations whether they represent private interests or the interests of the public.[17] The term "exclusively" is given a connotation that differs from the ordinary meaning of the term, and activities which are minor, and not substantial, do not disqualify charitable and educational organizations from the benefit of the exemption nor do they disqualify individual contributors to such organizations from a deduction. The

limitation is remedial and should be liberally construed.[18]

The political efforts of an organization must be balanced in the context of the objectives and circumstances of the organization to determine whether a substantial part of its activities is to influence, or is an attempt to influence, legislation. A percentage test to determine whether the activities are substantial is not appropriate. Such a test obscures the complexity of balancing the organization's activities in relation to its objectives and circumstances in the context of the totality of the organization.[19]

Although parity of treatment among taxpayers with respect to political activities was altered in 1962 for business interests, and in 1969 for private foundations, the revenue laws have not been changed in relation to the political activities of charitable and educational organizations that are subject to sections 501(c)(3) and 170(c)(2). Until new legislation is enacted, these organizations continue with the same limitations on their exemptions, and on the deductibility of contributions to them, that were established in the Internal Revenue Code of 1954, and the guidelines that have been established apply to NARP's operations in 1967 and 1968. Whether NARP was operated exclusively for charitable and educational purposes and whether a substantial part of its operations involved attempts to influence legislation are questions of fact to be determined through a comparison of its purely chari-

---

shall not apply to any amount paid or incurred in connection with an appearance before, or communication to, any legislative body with respect to a possible decision of such body which might affect the existence of the private foundation, its powers and duties, its tax-exempt status, or the deduction of contributions to such foundation."

15. 26 C.F.R. § 1.170–1(f) (1968).

16. Christian Echoes Nat'l Ministry, Inc. v. United States, *supra* note 8, 470 F.2d at 854.

17. League of Women Voters v. United States, 180 F.Supp. 379, 148 Ct.Cl. 561 cert. denied, 364 U.S. 822, 81 S.Ct. 57, 5 L.Ed.2d 51 (1960).

18. Seasongood v. Commissioner of Internal Revenue, 227 F.2d 907, 910 (6th Cir. 1955), and cases there cited.

19. Christian Echoes Nat'l Ministry, Inc. v. United States, *supra* note 8, 470 F.2d at 855; Dulles v. Johnson, 273 F.2d 362, 367 (2d Cir. 1959), cert. denied, 364 U.S. 834, 81 S.Ct. 54, 5 L.Ed.2d 60 (1960).

table activities to its activities to influence legislation.[20]

### Disposition of Claim

NARP's operations may be divided into four categories: administrative; educational; litigation; and legislative. The question then becomes whether the activities concerned with legislation are the type that are proscribed by sections 170(c)(2) and 501(c)(3) or whether those activities are the type of nonpartisan analysis, study, or research or of technical advice or assistance, that remove them from the limitation. For convenient reference, the terms "legislative activities" and "political activities" will be used hereinafter to identify action that is "carrying on propaganda, or otherwise attempting, to influence legislation," within the meaning of section 170(c)(2)(D).

Treasury regulations in effect in 1967 and 1968 under section 501(c)(3) excluded "nonpartisan analysis, study, or research and making the results thereof available to the public" from the definition of advocacy that was one of the two characteristics of an "action" organization. An "action" organization, by definition, was not operated exclusively for an exempt purpose and, accordingly, was not eligible as an exempt organization.[21] The section 501(c)(3) regulations, however, did not define what constitutes "nonpartisan analysis, study, or research" nor did these regulations state that the results of nonpartisan analysis, study, or research may be made available to legislative bodies when legislation is pending.

The Tax Reform Act of 1969 provides more precision. Section 4945(d) includes in the definition of a taxable expenditure of a private foundation amounts paid to carry on propaganda, or otherwise to attempt, to influence legislation "within the meaning of subsection (e)." In subsection (e), the "making available the results of nonpartisan analysis, study, or research" in communications with any member or employee of a legislative body or any other Government official or employee who may participate in the formulation of legislation is permissible and is not considered to be a proscribed attempt to influence legislation. No penalty attaches to a private foundation for making available the results of nonpartisan analysis, study, or research. By analogy, similar language in the section 501(c)(3) regulation in effect in 1967 and 1968 should permit charitable and educational organizations to undertake similar activity and not lose their exemption.

■ The Treasury regulations add further definition to what constitutes "nonpartisan analysis, study, or research." For the purposes of subsection 4945(e), "nonpartisan analysis, study, or research" means an *independent* and *objective* exposition of a particular subject matter. The term includes any activity which would be "educational," as defined in the regulations under section 501(c)(3).[22] Advocacy of a particular position or viewpoint qualifies as nonpartisan analysis, study, or research as long as there is a sufficiently full and fair exposition of the pertinent facts to enable the public or an individual to form an independent opinion or conclusion. Presentation of unsupported opinion does not qualify. The examples in the regulation make it clear that projects designed to present information merely of one side of a legislative controversy do not qualify as nonpartisan, nor do projects that fail to report avail-

---

20. Davis v. Commissioner of Internal Revenue, 22 T.C. 1091, 1099 (1954).

21. 26 C.F.R. § 1–501(c)(3)–1(c)(3)(iv)(b) (1968).

22. 26 C.F.R. § 53.4945–2(d)(1)(ii), *supra* note 5. 26 C.F.R. § 1.501(c)(3)–1(d)(3) (i)(b) provides that an educational organization may advocate a particular position or viewpoint so long as it presents a sufficiently full and fair exposition of facts as to permit an independent opinion or conclusion to be reached.

able information that would tend to dispute conclusions that are advocated.

■ "Nonpartisan," as used in the statute and regulations, need not refer to organized political parties. Nonpartisan analysis, study, or research is oriented to issues and requires a fair exposition of both sides of the issue involved. An organization's position on a particular issue may be partisan even though the position advocated has not become identified with any particular organized political party, and, conversely, it can be nonpartisan even though the issue is the subject of hotly contested legislation. The organization's position may be nonpartisan in relation to party politics, and still be partisan on a particular issue, and the issue may or may not be politically significant.

Section 4945(e) of the 1954 Code also permits private foundations to provide "technical advice or assistance" to a legislative body in response to a written request without incurring the penalty of having the expense deemed a taxable expenditure. The regulations under section 501(c)(3) do not refer to technical advice or assistance as such. Regulations under section 4945(e) provide that technical advice or assistance need not qualify as nonpartisan analysis, study, or research. Technical advice or assistance must be specifically requested, as must the offering of opinions or recommendations, and must be available to every member of the requesting committee.[23]

In addition to nonpartisan analysis, study, or research and technical advice or assistance, the Treasury regulations under section 4945(e) also exclude from taxable expenditures communications with members of legislative bodies that are an examination or discussion of broad social, economic, or similar problems. Such communications, however, must not be directly addressed to the merits of a specific legislative proposal being considered.[24]

The part of NARP's operations involved in the advocacy of the interests of railroad passenger consumers on legislative matters does not consist of activities which qualify as nonpartisan analysis, study, or research; nor can NARP's efforts on legislative matters properly be categorized as technical advice or assistance. NARP presented its information in a manner which would advance most forcefully its position that rail passenger service must be preserved. NARP was partisan on this issue, and the materials submitted in support of its position were not the full and fair objective expositions that would enable the public or an individual to reach an independent conclusion. NARP was nonpartisan from the standpoint of political party organization. It was partisan, however, on issues of passenger train discontinuances.

Recapitulation of the facts shows that NARP's legislative program was not "analysis, study, or research." Plaintiff, on behalf of NARP, appeared four times to testify and, in addition, made four written submissions to committees of Congress on pending legislation of concern to NARP. In addition, plaintiff made personal presentations to approximately five to 10 Members of Congress and personally conferred with from 15 to 30 congressional staff personnel on pending legislation that could affect the rail passenger. To further its goals and to focus its legislative programs, NARP retained a permanent Washington representative that warranted it possessed expertise in the fields of public relations, education, and congressional lobbying. NARP's Washington representative, on its behalf, performed the myriad activities incident to NARP's appearances before, or submissions to, congressional committees and conducted a continuing research program to keep abreast of railroad-related matters that were legislatively significant. NARP's Washington representative also made personal

---

23. 26 C.F.R. §§ 53.4945–2(d)(2)(i) and (ii) (1973).

24. 26 C.F.R. § 53.4945–2(d)(4) (1973).

presentations to Members of Congress and to congressional staff personnel on legislation of concern to NARP. In 1967 and 1968, NCA entertained at cocktails or luncheon for this purpose five Members of Congress, 16 legislative or administrative assistants to Members of Congress, and six professional or technical staff members of congressional committees. These activities, which were all part of the same partisan program, are more in accord with concepts of attempts to influence legislation rather than concepts that apply to the making available to governmental bodies nonpartisan analysis, study, or research.

■ NARP's efforts in legislative matters concerned pending legislation, and, for this reason, do not qualify as an examination or discussion of broad social, economic, or similar problems. Materials presented by NARP contained much information that was technical advice. The information, however, does not qualify as the technical advice or assistance contemplated by the statute and regulations. A simple invitation to testify or to submit a statement to a congressional committee is not in itself a request for technical advice or assistance. NARP's invitations had been arranged by NARP's Washington representative as part of its efforts to influence legislation and were not independent requests from the committee for specific technical advice or assistance. In these circumstances, the committees' invitations merely afforded an opportunity for a representative of the railroad passenger segment of the community to advocate its position.

■ Determination that NARP's operations relative to legislation were political activities and not excusable as nonpartisan analysis, study, or research, as technical advice or assistance, or as examination and discussion of broad social, economic, or similar problems does not dispose of the case. NARP's political activities must be compared with its exempted charitable and educational activities to determine whether the attempts to influence legislation were a substantial part of NARP's operations.

■ Although a percentage test is not determinative of substantiality, one measure of the relative significance of NARP's various activities in relation to its objectives is the amount of money devoted to each category of operations. In such analysis, the principle employed to allocate expenditures among the various classes of functions is crucial to the ultimate determination. Defendant would allocate certain administrative costs to legislative activities, but, in general, would exclude administrative overheads from its comparison of the costs of legislative activities on the one hand to the costs of NARP's educational and litigative activities on the other. Neither plaintiff's nor defendant's method of allocating expenditures provides an adequate measure of NARP's legislative activities in the context of plaintiff's total program.

■ In 1967, NARP's monetary expenditures necessarily reflected the problems involved in its initial organization and start-up. In 1968, NARP's administrative expenditures reflected a continuation of its membership solicitation efforts in addition to the costs of support activities that are essential to a going operation. NARP's support activities included, in addition to general office salary and overhead expenditures, expenditures for preparation of press releases and for printing and duplication of the information generated by NARP. Defendant would allocate some of these support expenditures, at least those related to press releases and printing and duplication costs, to specific legislative activities. NARP was a small operation and its accounting function was not sufficiently refined to distribute costs of press release preparation and, except for the Southern Pacific Report, the costs of printing and duplication, in such specific detail. To allocate these costs to specific legislative activities, as proposed, in the light of NARP's actual operations, is arbitrary. As a going

concern, moreover, NARP necessarily had to provide this type of ancillary support activity for its litigative and educational operations as well as its legislative activities. NARP's expenditures for press release preparation and distribution, and for printing and duplicating, included costs related to its charitable operations. Such expenditures are for normal support activities and, in the absence of records that permit precise distribution, properly should be included in the category of NARP's administrative expenditures.

Defendant would exclude administrative costs and would have only expenditures for NARP's charitable activities and educational activities considered in the determination of whether NARP's legislative activities were substantial. In an operation as small as NARP's, the costs of administrative functions necessarily consume a relatively large share of the total budget. Without such functions, however, the organization would not be viable. Exclusion of expenditures for administrative functions, even if it were possible to allocate some of the costs directly to legislative activities, does not put NARP's political efforts in proper perspective. According to defendant's allocation, for example, NARP's legislative activities in 1967 accounted for 76.1 percent of its expenses, and for 30.5 percent in 1968. Without these essential administrative functions, none of NARP's program could have been pursued, and inclusion of their costs is required to weigh the substantiality of NARP's legislative activities in its total operations.

 Both plaintiff and defendant request that the expenditures made to NCA be allocated either to legislative activities or to exempt charitable activities. The primary purpose for which plaintiff secured the services of NCA was to develop and implement NARP's legislative program. NCA's function was to lobby in Congress and in those sectors of the executive branch that could be influential on railroad legislation. NCA's efforts in NARP's initial

organization and in the selection of a prestigious board of directors for NARP were to develop an organization that would effectively obtain legislative goals. The time and effort devoted by NCA personnel to these organizational and consultative activities for NARP were incidental to its lobbying service and were part of NARP's legislative activities. For this reason, all of the expenditures by NARP to NCA properly should be allocated to attempts to influence legislation.

Amounts contained in NARP's travel and entertainment account have been allocated to legislative activities rather than to administrative overhead. Plaintiff acknowledges that the majority of NARP's travel and entertainment expenses were related to plaintiff's trips between Chicago and Washington to confer with NCA and were predominantly for the purpose of influencing legislation. In the absence of detail that would permit allocation to specific non-legislative activities, inclusion of the entire transportation and entertainment expense accounts of NARP as part of its legislative activities is appropriate.

 Allocation of NARP's expenditures on the foregoing basis shows that in 1967, from total expenditures of $50,259.12, NARP used $10,324.98, or 20.5 percent, on political activities. In 1968, from total expenditures of $103,761.12, NARP used $19,897.75, or 19.27 percent, on political activities. If an allocation is made for a salary to plaintiff, the percentage for political activities would be 17.04 percent in 1967, and 16.6 percent in 1968. These percentage relationships are an indication of the relative importance of legislative activities in NARP's total effort. The dollar amounts involved, although minuscule when compared to legislative expenditures of many organizations, are not de minimis. For an organization that operates on as small a total budget as NARP to devote so much of its total resources to legislative activities, it fairly can be concluded that its purposes no

longer accord with conceptions traditionally associated with a common-law charity.

Distribution of expenditures is only one measure of the substantiality of NARP's political activities. Plaintiff's arrangements with NCA prior to NARP's incorporation also indicate the importance of legislative efforts in plaintiff's program as a whole. The primary reason for securing NCA's services was to facilitate NARP's effort to make its position known on the ICC's legislative proposals to amend the Interstate Commerce Act. Before NARP was incorporated, plaintiff had acknowledged to NCA that his objective would require "substantial legislative action by the Congress." Further, NARP's brochure —"Yes—What's the real story about railroad passenger service?"—asserted a need to maintain permanent Washington representation "to work for the preparation of constructive legislation."

Attempts to influence legislation were not secondary or incidental to NARP's charitable purposes. The legislative program was a primary objective in NARP's total operations for preservation of railroad passenger service and is on an equal footing with its educational and litigative efforts.

The section 501(c)(3) regulations state that an organization will be considered as operated exclusively for an exempt purpose only if it engages primarily in activities which accomplish its exempt purposes. An organization is not exclusively operated for charitable purposes if more than an insubstantial part of its activities is not in furtherance of exempt purposes. Inasmuch as NARP's political activities were more than insubstantial, and such activities were not ancillary to NARP's charitable purposes, it

follows that NARP did not satisfy the requirement that it be exclusively operated for exempt purposes, as required by the regulation.

## II

Plaintiff asserts that interpretation of section 170(c)(2) to deny a charitable deduction for the payments to NARP in the circumstances of this case would infringe his rights to freedom of speech and peaceably to petition the legislature for redress of grievances under the first amendment, and the right to equal protection of the laws under the fifth amendment of the Constitution. Challenges to the constitutionality of the limitations in sections 170(c)(2) and 501(c)(3) have not been ruled upon finally by the Supreme Court and the same issues now are pending in lower courts.[25]

The danger of restrictions on first amendment rights long has been recognized and, in recent years, has been the subject of extensive reexamination. In other contexts, the Supreme Court has ruled that discriminatory denial of a tax exemption for engaging in speech is a limitation on free speech, and to deny a tax exemption to claimants who engage in certain forms of speech in effect is to penalize them for such speech. The deterrent effect is the same as if the Government were to fine the claimants for such speech.[26] A discrimination that impairs fundamental rights protected by the first amendment by placing a condition on a benefit or a privilege, as distinguished from a right, infringes the Constitution.[27]

Plaintiff relies upon *Speiser*, which struck down as violative of procedural due process a California statute that required a loyalty oath as a condition for

25. "Americans United" Inc. v. Walters, 155 U.S.App.D.C. 284, 477 F.2d 1169 (1973). On June 4, 1973, the Supreme Court granted review of the ruling below on the question of eligibility of an exempt organization to injunctive or declaratory relief under the Anti-Injunction and Declaratory Judgment Acts. Walters v. "Americans United" Inc., 412 U.S. 927, 93 S.Ct. 2752, 37 L.Ed.2d 154 (1973). The Supreme Court ruled on the Anti-Injunction issue on May 15, 1974. Alexander v. "Americans United" Inc., 416 U.S. 752, 94 S.Ct. 2053, 40 L.Ed.2d 518.

26. Speiser v. Randall, 357 U.S. 513, 518, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958).

27. Sherbert v. Verner, 374 U.S. 398, 404, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963).

a property tax exemption. Subsequently, the Supreme Court distinguished *Speiser* in Cammarano v. United States,[28] a case which, on its facts, is more apposite to the NARP relations. In *Cammarano*, the Supreme Court upheld regulations promulgated under the Internal Revenue Code of 1939 that excluded from deductions for "ordinary and necessary" business expenses sums that were expended "for the promotion or defeat of legislation." The Supreme Court upheld the regulation as expressive of the "sharply defined policy" of Congress that applied to the tax status of organizations that were otherwise qualified for exemption but which engaged in activities designed to promote or defeat legislation.[29] As to the first amendment issue, the Supreme Court stated that the ruling in *Speiser* was not relevant:

> * * * Petitioners are not being denied a tax deduction because they engage in constitutionally protected activities, but are simply being required to pay for those activities entirely out of their own pockets, as everyone else engaging in similar activities is required to do under the provisions of the Internal Revenue Code. Nondiscriminatory denial of deduction from gross income to sums expended to promote or defeat legislation is plainly not " 'aimed at the suppression of dangerous ideas.' " 357 U.S., at page 519, [78 S.Ct. 1332, at page 1338, 2 L.Ed.2d 1460]. Rather, it appears to us to express a determination by Congress that since purchased publicity can influence the fate of legislation which will affect, directly or indirectly, all in the community, everyone in the community should stand on the same footing as regards its purchase so far as the Treasury of the United States is concerned. [358 U.S. at 513, 79 S.Ct. at 533.]

Justice Douglas, concurring, further distinguished the first amendment restrictions involved in *Speiser* from the policy against attempts to influence legislation that was affirmed in *Cammarano*. Justice Douglas stated:

> * * * If Congress had gone so far as to deny all deductions for "ordinary and necessary business expenses" if a taxpayer spent money to promote or oppose initiative measures, then it would be placing a penalty on the exercise of First Amendment rights. That was in substance what a State did in Speiser v. Randall * * *. * * * Congress, however, has taken no such action here. It has not undertaken to penalize taxpayers for certain types of advocacy; it has merely allowed some, not all, expenses as deductions. Deductions are a matter of grace, not of right. * * * To hold that this item of expense must be allowed as a deduction would be to give impetus to the view favored in some quarters that First Amendment rights must be protected by tax exemptions. But that proposition savors of the notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State. Such a notion runs counter to our decisions * * *, and may indeed conflict with the underlying premise that a complete hands-off policy on the part of government is at times the only course consistent with First Amendment rights. * * * [358 U.S. at 515, 79 S.Ct. at 534.]

■ In this case, plaintiff's freedom of speech and right to petition Congress have not been impaired by denial of a tax deduction for his payments to NARP. The exercise of the freedom of speech is not free from taxation. Writers, speakers, newspapers, and similar individuals and organizations whose principal activities frequently directly involve first amendment rights are all subject to nondiscriminatory taxation on their incomes.

---

28. Cammarano v. United States, *supra* note 11.

29. *Id.*, 358 U.S. at 512, 79 S.Ct. 524, 3 L.Ed. 2d 462.

Recent authority supports the conclusion that the limitations contained in section 170(c)(2) do not deprive plaintiff of the constitutionally guaranteed right of free speech. In a 1972 case that involved protection to the freedom of religion secured by the first amendment, as well as the rights to free speech, the limitations on political activity in section 501(c)(3) were ruled constitutionally valid by the Tenth Circuit.[30] The court noted that first amendment rights are not absolute and stated:

> In light of the fact that tax exemption is a privilege, a matter of grace rather than right, we hold that the limitations contained in Section 501(c)(3) withholding exemption from nonprofit corporations do not deprive Christian Echoes of its constitutionally guaranteed right of free speech. The taxpayer may engage in all such activities without restraint, subject, however, to withholding of the exemption or, in the alternative, the taxpayer may refrain from such activities and obtain the privilege of exemption. The parallel to the "Hatch Act" prohibitions relating to political activities on the part of certain federal and state employees is clear: The taxpayer may opt to enter an area of federal employment subject to the restraints and limitations upon his First Amendment rights. Conversely, he may opt not to receive employment funds at the public trough in the areas covered by the restraints and thus exercise his First Amendment rights unfettered. * * *

Plaintiff advances two theories in support of his claim that application of section 170(c)(2) so as to deny the deduction for the payments to NARP would violate his rights to equal protection of the laws. First, such application is said to discriminate between individuals who contribute to charitable organizations in that it makes tax status for charitable contributions determinative on whether the organization engages in the specifically protected first amendment right to petition the legislature. The class involved would be all individuals who contribute and all organizations which receive charitable contributions. Contributors to an exempt organization that was not engaged in political activities, but whose activities not in furtherance of its exempt purposes were more than insubstantial but less than substantial, would be eligible for a deduction. The deduction would be denied however, if more than an insubstantial part of the organization's activities was a legislative action proscribed by section 170(c)(2).

Plaintiff's second theory is that equal protection rights would be infringed by the adverse application of section 170(c)(2) because contributors to NARP would be denied a tax deduction for lobbying on the same legislation and issues that businesses are permitted to lobby against, and to deduct, under Section 162(e) of the Internal Revenue Code of 1954, the costs of such lobbying as ordinary and necessary business expenses. Railroad passenger consumers who contribute to NARP would be denied the use of a tax deductible vehicle for carrying on legislative activities against railroads, whereas the railroads, railroad unions, railroad suppliers, and other business organizations involved in the very same legislative activities with respect to the same legislation would have such a deduction.

In federal jurisdictions, rights to equal protection under the laws are derived from due process protections in the fifth amendment. The fifth amendment does not contain an equal protection clause; it does, however, forbid discrimination that is so unjustifiable as to violate concepts of due process.[31] Under the traditional standards,

---

30. Christian Echoes Nat'l Ministry, Inc. v. United States, *supra* note 8, 470 F.2d at 857.

31. Bolling v. Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954); also Shapiro v. Thompson, 394 U.S. 618, 642, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969).

equal protection is denied only if the classification is "without any reasonable basis."[32] Where the classification touches a fundamental right, however, such as interstate movement or first amendment rights, a stricter standard applies, and the classification is judged on the basis of whether it promotes a *compelling* state interest.[33]

The classification described in plaintiff's first theory—all individuals who contribute and all organizations that receive charitable contributions—is too broad. Organizations to which payments are made may be divided into at least two classes on the basis of purpose and scope of operations. A small organization that devotes a substantial part of its energies and resources to attempts to influence legislation has a different purpose than a large organization that utilizes only an insubstantial and relatively small part of its total resources for such legislative activities.[34]

Section 170(c)(2)(D) makes such a classification appropriate. Contributors to an organization whose political activities involve only an insubstantial part of its total efforts are motivated to different objectives, and their interests permit recognition as a separate class. Contributors to an organization that has as a primary purpose political action and whose political activities require a substantial part of its total efforts, on the other hand, have different interests and objectives for their payments.

Congressional interest in prevention of the use of tax funds to support lobbying is compelling. Attempts to influence legislation are not the same as educational, charitable, religious, or scientific activities and they involve well-recognized dangers to representative Government procedures. Congress is not re-

quired to grant tax subsidies, directly or indirectly, to the affluent. The tax laws are not an appropriate vehicle for the Government to undertake to determine the extent to which a charitable organization's attempts to influence legislation involve the public interest or are to further other interests.

With respect to the classification in plaintiff's second theory—a class of charitable organizations and a class of business organizations—such division has been long recognized and is reasonable. Congress has recognized the propriety of a deduction as an ordinary and necessary expense for business with respect to legislation or proposed legislation that directly affects the ability of business to produce income and to pay taxes thereon. The deduction is related to the profit-motivated activities of the taxpayer. Activities of charitable organizations stem from different motivations, and contributions to such organizations are matters of personal concern. Absence of a standard generally applicable justifies differentiation in a separate class.

NICHOLS, Judge (concurring):

I concur in the result. The trial judge holds that National Association of Railroad Passengers (NARP) the donee of plaintiff's contributions, was disqualified because not operated exclusively for the purposes required by IRC of 1954, § 170(c)(2)(B) and (emphasis supplied) a substantial part of its activities involved attempts to influence legislation per § 170(c)(2)(D). I deem the former holding clearly correct. Slee v. Commissioner of Internal Revenue, 42 F.2d 184 (2d Cir. 1930). An organization like NARP has a choice of seeking its ends by advocating or opposing legislation in Congress or by "public interest" litigation

---

32. Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78, 31 S.Ct. 337, 55 L.Ed. 369 (1911).

33. Shapiro v. Thompson, *supra* note 31, 394 U.S. at 638, 89 S.Ct. 1322.

34. This classification was suggested in the concurring opinion in "Americans United" Inc. v. Walters, *supra* note 25, as follows:

"In short, it is certainly arguable that small groups are not being treated differently by § 501(c)(3) because they are small, but because they are obviously operating for a different purpose if they devote their comparatively small funds on a much different proportionate basis to propaganda for legislation." 73–1 U.S.T.C. at 80,225.

in the courts. NARP did both. The former is the most direct possible form of petitioning for redress of grievances under Amendment I of the Constitution. To hold that an organization that has qualified under subsec. (B) loses its status because it petitions even though in the most correct and lawful fashion, but not if it litigates, however unethically, or foments litigation, is to create a discrimination that raises constitutional difficulties for me that neither the trial judge nor the authorities he cites wholly resolve. Cases should be decided if possible without raising or dealing with Constitutional difficulties and this can be done here by resting the decision on subsec. (B) and not going on to subsec. (D) on the hypothesis, contrary to fact, that the organization qualifies so far as (B) is concerned.

### CONCLUSION OF LAW

Upon the foregoing opinion and the findings of fact, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and the petition is dismissed.